[No. 24099-4-I.   Division One.   March 11, 1991.]

ATHENA GARCIA, ET AL, *Appellants,* v. PROVIDENCE
MEDICAL CENTER, ET AL, *Respondents.*

*John P. Walsh, Thomas A. Thompson,* and *Walthew, Warner, Costello, Thompson & Eagan, P.S.,* for appellants.

*Timothy D. Blue, Rebekah R. Ross,* and *Williams, Kastner & Gibbs,* for respondent Providence Medical Center.

*John C. Graffe* and *Rosenow, Hale & Johnson,* for respondent Seattle Indian Health Board.

*Reed P. Schifferman, Patricia H. Welch,* and *Lane Powell Spears Lubersky,* for respondent Mayfield.

PEKELIS, J.—Athena Garcia appeals several trial court orders and evidentiary rulings arising out of her medical malpractice suit against Providence Medical Center (Providence), the Seattle Indian Health Board (SIHB), and Jennifer Mayfield, M.D. (Dr. Mayfield). She contends that the trial court erred in (1) denying her motion in limine to exclude evidence of her prior abortions and a prior referral to Child Protective Services (CPS) following a report of child abuse, (2) granting a motion for a directed verdict in favor of Mayfield and the SIHB, and (3) admitting the testimony of respondents' expert witnesses and excluding the

deposition testimony of her expert witness, Dr. Peter Watson. She also assigns error to the court's refusal to give two of her proposed jury instructions and failure to impose CR 11 sanctions. We reverse the judgment against Providence and remand for a new trial. We affirm the judgment in favor of the remaining respondents.

FACTS

Garcia's pregnancy was first diagnosed in November 1984. During the course of her pregnancy she visited the SIHB on eight occasions for prenatal care. At that time, the obstetrics team at the SIHB consisted of Doctors Jane Fellner, Peter Talbot, Jennifer Mayfield, and consultant Dr. Richard Agress. Dr. Fellner, a family practitioner, was an employee of the SIHB. Dr. Mayfield, also a family practitioner, was a fellow at the University of Washington volunteering at the SIHB. Dr. Talbot was a federal employee stationed at the SIHB. Dr. Agress was an obstetrician in private practice providing obstetrical/gynecological consultation services to the SIHB.

On June 13, 1985, Garcia was examined by Dr. Mayfield at the SIHB. Dr. Mayfield estimated that the gestational age of the fetus was approximately 38 weeks, or nearly term.

On June 20, 1985, Garcia was examined by Dr. Fellner. Garcia informed Dr. Fellner that she was not sure if the baby was moving as it usually had. Dr. Fellner noted this on Garcia's prenatal chart by writing "Question mark, arrow down, fetal movement." Dr. Fellner instructed Garcia to go home and count fetal movements.

On June 27, 1985, Garcia was seen by Dr. Mayfield for a second and last time. She told Dr. Mayfield that the baby was not moving or kicking as much as it had been. Dr. Mayfield explained to her that babies normally slow down prior to term. She listened to the heartbeat and informed Garcia that everything was fine.

On July 3, 1985, Garcia was examined again by Dr. Fellner. She complained of decreased fetal movement and also

reported that she was experiencing contractions. Dr. Fellner referred Garcia to the labor and delivery department at Providence for an evaluation of her early labor.

Garcia was admitted to Providence at approximately 1:45 in the afternoon by Elizabeth Berkey, R.N. Garcia informed Nurse Berkey that she had been feeling decreased fetal movement over the previous 24 hours. To help assess the status of the baby, Nurse Berkey placed an external fetal monitor on Garcia.

Electronic fetal heart rate monitoring is used to test fetal well–being. The mechanism produces a "fetal heart rate strip," which is analyzed to determine various parameters, including fetal heart rate variability, *i.e.*, the moment to moment changes in the heart rate. The strip has two segments, the top part representing the fetal heart rate and the bottom segment representing uterine contractions. A drop in the fetal heart rate below the base line is termed a deceleration. A clear pattern of late decelerations is associated with fetal hypoxia, or a decrease in oxygen to the baby.

The first time Garcia was placed on a monitor, the fetal heart rate and beat to beat variability were in the low end of the normal range. Nurse Berkey called Dr. Fellner at 2:30 p.m., and told her the output of the strip. Dr. Fellner instructed Berkey to have Garcia walk around for half an hour to see if the baby would become more active. Garcia was put back on the monitor at 3:08 in a new labor and delivery unit. The base line on the strip indicated a mild decrease in beat to beat variability.

Nurse Berkey reported Garcia's status to Nurse Suzanne Hutchinson, whose shift started at 3 p.m. At 3:45, Nurse Hutchinson called Dr. Fellner again. She gave Garcia oxygen. Because the strip was worrisome, Dr. Fellner communicated her concerns to Dr. Talbot, who was to be on call that evening. Responsibility for Garcia's care switched from Dr. Fellner to Dr. Talbot between 3:45 and 4 p.m. that afternoon.

Dr. Talbot consulted with Dr. Agress, who recommended administering Oxytocin, a synthetic hormone that causes labor contractions, to see how the baby responded to the stress. At 4:21 p.m. Dr. Talbot phoned the obstetrical department and spoke with Nurse Lauren Collins. He advised her to administer the Oxytocin. Before doing so, Nurse Collins looked at the fetal heart rate strip and noticed late decelerations and decreased variability of the heart rate. At 4:25 she phoned Dr. Talbot and reported her observations. Dr. Talbot responded that he would be in around 5 p.m. At 4:31 p.m. Nurse Collins phoned Dr. Talbot and told him to come in "stat", meaning that there was an emergency. Two minutes later the heart rate disappeared.

Drs. Talbot and Agress arrived at 4:45 p.m. Dr. Agress artificially ruptured the membrane at 4:47 p.m. Garcia was taken to the delivery room. At approximately 5:05 p.m. Dr. Agress performed an emergency Caesarean section delivery. There was no anesthesiologist available at that time, so Garcia was given multiple injections of Xylocaine and intravenous morphine. Shortly after delivery, at 5:10 p.m., an anesthesiologist arrived and Garcia was given general anesthesia for the remainder of the operation.

The infant, Alejandro, was born severely asphyxiated. He was later transferred to Children's Orthopedic Hospital where he died a week later.

On July 11, 1986, Garcia filed suit against Providence and the SIHB for medical malpractice, pursuant to RCW 7.70 (Actions for Injuries Resulting From Health Care). On March 15, 1989, the trial court denied her motion in limine to prohibit reference to her three prior abortions and to a visit by a CPS caseworker following a report of child abuse. The trial court specifically ruled that the evidence referred to was admissible.

At trial, Garcia informed the court that her principal expert witness, Dr. Peter Watson, would be unavailable to testify, and sought to introduce his deposition into evidence. Over Garcia's objections, the court declined to admit

the depositions, the first of which was taken before Dr. Mayfield was joined as a named defendant.

A second expert witness, Nurse Beverly Easterwood, testified on behalf of Garcia. She gave her opinion of the nursing care provided to Garcia by Providence's labor and delivery staff. Easterwood stated that Nurse Berkey departed from the standard of care when she initially removed Garcia from the fetal heart rate monitor at 2:25 p.m. because the fetal tracing was abnormal. Easterwood further testified that when Garcia was placed back on the fetal monitor at 3:15 p.m., the fetal strip was still non-reassuring, and remained so at 3:30, 3:45, and 4 p.m. According to Easterwood, Berkey should have told Dr. Fellner to come in to the hospital and personally evaluate the fetal strip. The failure to do so was also a departure from the standard of care.

At the close of Garcia's case, the court granted directed verdicts in favor of the SIHB and Dr. Mayfield. After an 8–day trial, the jury returned a verdict in favor of the remaining defendant, Providence. Garcia's motion for a new trial was denied.

The respondents then submitted cost bills, which included the costs of two depositions used at trial. Garcia challenged those costs, and moved for sanctions under CR 11. The trial court denied both the requested deposition costs and Garcia's motion for sanctions.

### EVIDENCE OF PRIOR ABORTIONS AND A CPS REFERRAL

Garcia first challenges the trial court's ruling in limine which allowed the admission of portions of her medical records which made specific reference to three prior abortions. She also assigns error to the trial court's ruling allowing evidence that a CPS caseworker came to see her because a report had been made accusing Garcia of child abuse. She argues that this evidence is irrelevant to her claim of emotional damages, or, in the alternative, even if it is deemed to be minimally relevant, its prejudicial effect so

exceeded its probative value that it was error to allow it in evidence.

Respondents contend that the evidence on prior abortions was directly relevant to Garcia's claims of emotional damage. They assert that this court need not even reach the issue, however, because Garcia did not object to its introduction at trial. Moreover, they contend, Garcia was not prejudiced by the evidence of her abortions since she was the first to refer to it.

■ We address first the threshold matter of whether Garcia has preserved this issue for appeal. The rule in Washington is that "unless the trial court indicates further objections are required when making its ruling, its decision is final and the party losing the motion in limine has a standing objection." *State v. Ramirez,* 46 Wn. App. 223, 229, 730 P.2d 98 (1986) (citing *State v. Kelly,* 102 Wn.2d 188, 685 P.2d 564 (1984)).

Here, since the trial court expressly ruled that it was denying the motion, the trial court's ruling on Garcia's motion in limine was clearly a final ruling on the record. The record is devoid of any suggestion that the court was making a tentative or advisory ruling. Thus, Garcia had no duty to object again in front of the jury.

■ In light of the definitive ruling by the trial court, the fact that Garcia herself was the first to mention her prior abortions at trial should not preclude her from now appealing. A party is entitled to try to minimize the adverse effect of a decision by raising the damaging testimony first. Thus, we hold that Garcia has not waived review of the issue by her conduct.

■ Addressing next the merits of her claim, Garcia contends that the evidence she challenges bears absolutely no relevance to the issues raised by her claims. The trial court refused to exclude the evidence, however, because it concluded that the fact of her prior abortions was relevant to

Garcia's claim for emotional damages.[1] A motion in limine is addressed to the discretion of the trial court and will be reversed only in the event of abuse of discretion. *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 91, 549 P.2d 483 (1976); *Equitable Life Leasing Corp. v. Cedarbrook, Inc.*, 52 Wn. App. 497, 503, 761 P.2d 77 (1988). A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

ER 401 and 402 define relevant evidence and direct that it be admissible except where otherwise provided by constitution, statute, or court rule. The test of relevancy is whether the evidence has a tendency to make the existence of the fact to be proved more probable or less probable than it would be without the evidence. *State v. Renfro*, 96 Wn.2d 902, 906, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982). ER 403 further requires that the evidence be more probative than prejudicial. *Kirk v. WSU*, 109 Wn.2d 448, 462, 746 P.2d 285 (1987).

■ The evidence adduced on this issue does not establish the relevance of Garcia's prior abortions to her present claims for emotional damages. At trial, Dr. Philip Lindsay testified that he had examined Garcia and diagnosed her as suffering from "posttraumatic stress disorder" and general depression. Although Dr. Lindsay was unaware of her three prior abortions until trial, when asked by counsel for Garcia if this information would have affected his diagnosis, he gave the following response:

A. No.
Q. Now, can you explain why?

---

[1]The trial court also reasoned that it could not delete the references of Garcia's prior abortions from her medical records because that would have "changed the facts" of the case. This does not justify the admission of irrelevant evidence. Even seemingly relevant facts must at times be excluded because an evidentiary rule prohibits the admission of such matters. *See, e.g.,* ER 404(b) (exclusion of prior bad acts); *see also State v. Holmes*, 43 Wn. App. 397, 399, 717 P.2d 766 ("even though logically relevant, evidence must also be legally relevant"), *review denied*, 106 Wn.2d 1003 (1986).

A. What I would, uh, want to, uh, have if it were going to change my impression would be a clear–cut history of post-traumatic stress disorder which usually is not following an abortion. Uhm, and, uh, or a history of major depression prior to this incident. In the absence of that I think the probability of it playing a significant role is very low.

In effect, Garcia's expert witness stated that the fact that she had three prior abortions would not, in itself, change his opinion that it was the traumatic labor and subsequent death of Alejandro which caused her emotional damages. Compare *Davila v. Bodelson,* 103 N.M. 243, 249, 704 P.2d 1119, 1125 (1985) (evidence of three prior abortions admissible where defendant physician testified that he would not have prescribed labor inducing drug had plaintiff informed him of them).

Garcia claims support for her position in *Kirk.* There, the court affirmed a trial court ruling in limine excluding evidence of the plaintiff's prior abortions. *Kirk,* 109 Wn.2d at 464. Citing ER 403, the court concluded that statements made by expert witnesses that the abortions were "possibly" a factor in the plaintiff's preinjury depression were not sufficiently relevant to outweigh the prejudicial nature of the evidence. *Kirk,* 109 Wn.2d at 462–63.

Respondents, on the other hand, argue that *Kirk* does not compel reversal of the trial court's ruling in this case. We agree with respondents that the *Kirk* holding that the trial court did not abuse its discretion by *excluding* evidence of prior abortions does not necessarily mean that the trial court abused its discretion here by *admitting* evidence of prior abortions. However, *Kirk* is instructive in analyzing the issue before us. In *Kirk,* the "possible" relationship between the abortions and the plaintiff's depression was not enough to establish their relevancy. Here, there was even less evidentiary basis for the admission of such evidence. No witness testified that the fact that Garcia had abortions sometime in the past was even of *possible* relevance to the issue of her claim for emotional damages. Hence, respondents' position that Garcia's prior abortions bear on the issue of her damages depends on several

implicit assumptions, which we decline to accept. The first is an inference that voluntary abortions in themselves necessarily cause continuing emotional distress. The other is that if a woman has voluntarily consented to an abortion, she is less affected by the pain of the loss of a child than a woman who never voluntarily terminated a pregnancy. We reject both per se positions and hold that, consistent with our rules of evidence, in order for such testimony to be admissible, there must be some factual evidence in the record demonstrating such a connection or expert testimony which establishes it by a more probable than not standard.

Thus, because the evidence failed to pass the bare test of relevancy under ER 401, we conclude the trial court abused its discretion in admitting evidence of Garcia's prior abortions.

We next determine whether the error was so prejudicial that it requires reversal. In view of strong and opposing attitudes concerning abortion, it is difficult to imagine how such evidence would not have an extremely prejudicial effect on the jury. *See People v. Morris,* 92 Mich. App. 747, 285 N.W.2d 446 (1979). Respondents suggest that Garcia had a full opportunity to eliminate any possible prejudice from the evidence because she was able to ask questions of the jurors about their attitude toward abortion on voir dire. We do not believe, however, that deep–seated feelings on this highly personal and controversial issue could be sufficiently flushed out during voir dire to eliminate the inherent prejudice of its admission.

Thus, we conclude that the erroneous admission of Garcia's prior abortions alone warrants reversal and a new trial against Providence.[2] The remainder of this opinion has no precedential value. Therefore, it will be filed for public

---

[2]Our analysis also obtains to the issue of the admission of evidence that Garcia had been visited by a CPS caseworker following a report of child abuse. Like the evidence of her prior abortions, there was no evidence connecting this incident to any issue at trial. Moreover, this hearsay allegation from an unknown source

record in accordance with the rules governing unpublished opinions.

COLEMAN and FORREST, JJ., concur.

was never confirmed. Thus, this ruling of the trial court was also an abuse of discretion in that the evidence was not shown to be relevant, and was so highly inflammatory that it prejudiced Garcia.