[No. 17927-0-II.   Division Two.   August 9, 1996.]

THOMAS R. MEDCALF, *Appellant*, v. THE DEPARTMENT OF LICENSING, *Respondent*.

*David S. Marshall* and *Prince, Kelley, Marshall & Bassingthwaighte, P.S.*, for appellant.

*Christine O. Gregoire, Attorney General*, and *James T. Schmid, Assistant*, for respondent.

HOUGHTON, A.C.J. — Thomas R. Medcalf appeals a superior court order affirming the Department of Licensing's (the Department) revocation of his driver's license for refusing to take a breath test. Medcalf contends that the trial court erred in excluding (1) testimony from his treating physician that Medcalf could not take the breath

test because he was experiencing an acute episode of obsessive-compulsive disorder (OCD) and (2) evidence that Medcalf was acquitted on the related charge of driving while intoxicated (DWI). Because evidence of a mental condition is not a defense for refusal to take a breath test, and because an acquittal for DWI is irrelevant to a revocation proceeding, we affirm.

## FACTS AND PROCEDURAL HISTORY

On June 22, 1991, Winslow Police Officer Denise Giuntoli stopped Medcalf for driving without his headlights. She arrested Medcalf for exhibiting signs of intoxication and took him to the police station. Medcalf asked to speak to a lawyer upon arriving at the "BAC area where the Breathalyzer is" located. Medcalf was unable to reach his attorney by telephone, so he spoke with a public defender. Medcalf requested that the attorney come to the station, and when he would not, Medcalf again requested to speak to his lawyer. Officer Giuntoli told him he could contact any lawyer he chose, and Officer Kevin Jepson explained that the public defender would not come to the station.

After the discussion regarding counsel, Officer Giuntoli read Medcalf his Miranda[1] rights. Medcalf acknowledged these rights and signed the form stating that he understood them. Medcalf invoked his right to remain silent. Officer Giuntoli then read Medcalf his implied consent rights. Medcalf was told that he had a right to refuse the breath test, but that if he refused his license would be revoked. Medcalf "stated that he wouldn't lose his license; he didn't believe [her]." Medcalf refused to submit to the breath test; Officer Giuntoli again explained the consequences of his refusal to take the test, but he still refused to take the test.

Officer Giuntoli issued Medcalf a citation for DWI. Medcalf refused to sign the citation and he was placed in jail. Officer Giuntoli testified that Medcalf appeared capable of

---

[1]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

answering her questions and, for the most part, did answer them. She submitted a "Report of Refusal" on Medcalf to the Department approximately nine months after the incident, which she had rewritten because the first report was apparently misplaced.

Officer Jepson corroborated Officer Giuntoli's statement that Medcalf insisted on having an attorney come to the station. When Medcalf was asked to take the breath test, he responded that he wanted an attorney brought to the station. Officer Jepson witnessed Officer Giuntoli read the implied consent form to Medcalf, and then explained the form to him. Officer Jepson also explained to Medcalf that his license would be revoked if he refused the test, to which Medcalf responded, "no, it won't." Officer Jepson testified that: Medcalf refused to sign the DWI citation, Jepson explained that Medcalf would be arrested for not signing the citation, Medcalf still refused to sign, and Medcalf was arrested and taken to jail.

Medcalf maintained that he wanted to take the breath test to prove that he was not intoxicated. Medcalf asserted that he tried to take the test, but was unable. He admitted that he asked to speak to an attorney and claimed that he only spoke to someone who purported to be the public defender. Medcalf admitted that he knew the consequences of refusing to take the breath test, but asserted that he was unable to submit to the test.

On May 21, 1992, the Department conducted a formal implied consent hearing pursuant to RCW 46.20.308(8). On June 12, 1992, the Department issued a written order finding that Medcalf was arrested, was advised of the statutory implied consent warnings, was not in a condition rendering him incapable of refusal, was not confused, and refused to take the breath test. On June 25, 1992, the Department issued an order revoking Medcalf's license for two years.

On July 23, 1992, Medcalf appealed the Department's revocation of his driver's license to superior court. The Department asserted that the court's de novo review was

limited to the following issues: (1) whether the officer had reasonable grounds to believe that Medcalf was operating a vehicle under the influence of intoxicating liquor; (2) whether Medcalf was arrested; (3) whether the officer informed Medcalf of his statutory implied consent rights; and (4) whether Medcalf refused to consent to the breath test.

In his trial brief, Medcalf asserted that he suffers from OCD, an anxiety disorder. He then outlined testimony on OCD by his expert, Gerald M. Rosen, Ph.D. Medcalf maintained that he had an OCD episode on June 22, 1991. Medcalf stated that he drank some beer in Seattle after work and then took the 2:00 a.m. ferry to Winslow. He slept on the ferry and was awakened by a ferry worker knocking on his window. In his rush, he popped one of the lenses out of his glasses, so did not put them on before driving off of the ferry. He also forgot to turn on his headlights. Officer Giuntoli stopped Medcalf for driving without his headlights.

Medcalf explained his OCD to Officer Giuntoli; but, she still arrested him for exhibiting signs of intoxication. Medcalf claimed that he went to the station intending to take the breath test to prove that he was not intoxicated. Apparently, Medcalf wanted to take the test because his license had previously been suspended for a year. Medcalf claims that his OCD attack became more severe at the station and that his panic prevented him from taking the test and from signing the agreement to appear. Medcalf also asserted that he was found guilty of negligent driving, but not of DWI.

At the December 7, 1993 hearing, the Department moved to exclude all evidence regarding OCD and all reference to the related criminal proceeding. Medcalf made the following offer of proof regarding Dr. Rosen's testimony. Dr. Rosen testified that OCD is a brain disorder in which the brain has problems "inputting" information and regulating the emotional reactions to that information. He asserted that OCD is caused by the biology of the

brain, either neurotransmitter levels or structural problems with the brain. Thus, he concluded that the underlying mechanism for OCD is a physical condition.

Dr. Rosen stated that Medcalf is one of his patients, who has an OCD "revolv[ing] around images of violence, crimes, and other stimuli associated with the judicial system." More specifically, Medcalf engaged in the ritual of duplicating his actions to purify and control his bad thoughts.

Medcalf's OCD began after his daughter's death in 1981. Dr. Rosen testified that an episode involving the improper discharge of a weapon while Medcalf worked as a reserve police officer appeared to have provided the theme for his OCD. Dr. Rosen explained that in an OCD episode concerning thoughts, Medcalf would experience a thought and then believe that he had to think another particular thought to counteract the effect of the prior thought before he could continue his thoughts. Medcalf's episodes of OCD could be triggered by high levels of stress or by encountering a triggering situation.

Medcalf was treated unsuccessfully until 1985 when he checked into the UCLA's treatment unit. During his time at the UCLA program, Medcalf began experiencing undesirable thoughts about "prisons, executions and the judicial system," which he would counter by engaging in ritualistic, repetitive positive thoughts. Upon discharge from that program, Medcalf continued his treatment with Dr. David Dunner monitoring his medication and Dr. Rosen providing behavioral treatment.

Dr. Rosen opined that the June 22, 1991 traffic stop would have been a "classic" situation triggering Medcalf's OCD because it involved the judicial system, police officers, the perception that he was a criminal, and general notions of crime and violence. Dr. Rosen testified that Medcalf could have had an OCD response to the request that he take the breath test. He explained that if Medcalf were having an OCD response to the request to take the breath test, he would not have been able to take the test until he had corrected his bad thoughts triggered by the

request. Dr. Rosen concluded that there was "a good likelihood that [Medcalf's] [OCD] rendered him unable to comply with the request to take the Breathalyzer test."

Dr. Rosen admitted that OCD is a mental disorder with an organic origin. He also admitted that, while a layperson could observe the symptoms of the OCD, there was no way to observe its physical cause. On examination by the court, Dr. Rosen admitted that OCD was generally accepted as an anxiety disorder, not an organic disorder.

As part of his offer of proof, Medcalf testified about being stopped by Officer Giuntoli. Medcalf testified that his OCD attack began when Officer Giuntoli pulled him over. Medcalf stated that he willingly followed the officer to take the breath test and that he wanted to take the test to prove that he was innocent. He testified that he was seated next to the Breathalyzer machine, that the officer began reading instructions to him, and that he went off into his own world of thoughts. Medcalf testified that he did not know what was going on in the room, that he was trying to bring himself out of the episode, and that he was combating thoughts so it was impossible for him to respond to the officer or to take the test.

The trial court granted the Department's motions in limine, excluding all reference to the disposition of the related criminal proceeding and all testimony regarding OCD. The trial court excluded the OCD testimony based upon case law holding that a mental condition is not a valid defense in a license revocation hearing. The trial court also concluded that OCD was currently recognized as an anxiety disorder, not an organic (physical) disorder.

After the rulings on the motions in limine, a jury trial ensued. The parties stipulated that Medcalf was arrested and that Officer Giuntoli had reasonable grounds to believe that Medcalf was driving while intoxicated.[2]

---

[2]Medcalf made this stipulation to avoid having Officer Giuntoli testify about Medcalf's behavior indicative of intoxication, which, pursuant to the trial court's order in limine, could not be rebutted by Dr. Rosen's testimony about OCD. VRP 85-86.

The jury then heard testimony from Officers Giuntoli and Jepson and from Medcalf regarding the events of June 22, 1991.

On January 5, 1994, the trial court entered a judgment on the verdict, upholding the Department's revocation of Medcalf's license. Medcalf appeals this jury verdict. On Medcalf's motion, this court stayed enforcement of the judgment.

## ANALYSIS

On appeal, Medcalf argues that the trial court erred in excluding the testimony about Medcalf's OCD and about his acquittal on the DWI charge.

### A. Standard of Review

■ We review a trial court's grant of a motion in limine for an abuse of discretion. *Garcia v. Providence Medical Ctr.*, 60 Wn. App. 635, 642, 806 P.2d 766 (citing *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 91, 549 P.2d 483 (1976); *Equitable Life Leasing Corp. v. Cedarbrook, Inc.*, 52 Wn. App. 497, 503, 761 P.2d 77 (1988)), *review denied*, 117 Wn.2d 1015 (1991). A trial court abuses its discretion only when its ruling is based upon untenable grounds or untenable reasons. *Garcia*, 60 Wn. App. at 642 (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). We will reverse a trial court's ruling only if no reasonable person could have so ruled. *Tewell, Thorpe & Findlay, Inc., P.S. v. Continental Casualty Co.*, 64 Wn. App. 571, 578, 825 P.2d 724 (1992) (additional citation omitted).

The trial court must admit relevant evidence that tends to make the existence of a material fact more or less probable. ER 401, 402; *Garcia*, 60 Wn. App. at 642 (additional citation omitted). The trial court must exclude evidence, however, when its probative value is outweighed by the potential that the evidence will unduly prejudice the other

party or confuse the jury. ER 403; *Garcia*, 60 Wn. App. at 642 (additional citation omitted).

Medcalf asserts the trial court made an error of law, subject to de novo review. He argues that the trial court's decision to exclude the OCD testimony was based upon an erroneous application of the statute. Essentially, Medcalf asserts that pursuant to RCW 46.20.308(7) and (8), a trial court must admit any evidence related to whether Medcalf refused to take the breath test, including evidence on OCD's impact on his capacity to take the breath test, without applying the case law interpreting the other provisions of the statute. Medcalf distinguishes the court's interpretation of the "otherwise in a condition rendering him . . . incapable of refusal" language in RCW 46.20.308(4), arguing that this provision merely provides guidelines for the police in administering breath tests. Medcalf also distinguishes the cases holding that evidence of a mental disorder is not a defense for refusal to take a breath test and that only physical conditions apparent to the officer may excuse non-responsiveness of a driver. He argues the trial court erred as a matter of law in using this case law to determine that Medcalf's OCD evidence was inadmissible. We disagree.

*B. Statutory Background*

Washington's implied consent statute, RCW 46.20.308, provides in part that a law enforcement officer with reasonable grounds to believe that a person is driving while intoxicated shall administer a breath test to determine the person's blood alcohol content. *Department of Licensing v. Lax*, 125 Wn.2d 818, 821, 888 P.2d 1190 (1995). The statute also provides that the officer must warn the driver that refusal to take the test will result in revocation of the driver's license and may be used in a criminal trial. *Lax*, 125 Wn.2d at 821 (citing RCW 46.20.308(2)).

Pursuant to RCW 46.20.308(4):

> Any person who is dead, unconscious, or who is otherwise in a condition rendering him or her incapable of refusal, shall be deemed not to have withdrawn the consent provided by

subsection (1) of this section and the test or tests may be administered, subject to the provisions of RCW 46.61.506,[3] and the person shall be deemed to have received the warnings required under subsection (2) of this section.

Unless subsection (4) applies, no test shall be given when the driver refuses the test. *Lax*, 125 Wn.2d at 821 (citing RCW 46.20.308(5)).

The Department must revoke the driver's license once it receives a sworn report that the driver refused to submit to the breath test. *Lax*, 125 Wn.2d at 821 (citing RCW 46.20.308(6)). Upon revocation, a driver may request a formal hearing before the Department, for determination of (1) "whether a law enforcement officer had reasonable grounds to believe [that] the person had been driving . . . under the influence of intoxicating liquor"; (2) "whether the person was placed under arrest"; and (3) "whether the person refused to submit to the test . . . upon request of the officer after having been informed that such refusal would result in the revocation of the person's license." Former RCW 46.20.308(7) (LAWS OF 1989, ch. 337, § 7). If the Department upholds the revocation, the driver may seek de novo review of the Department's revocation before the superior court. RCW 46.20.308(8).

The only issue in this case is whether Medcalf refused to submit to the test. In particular, this case requires us to examine what evidence is admissible at trial regarding whether Medcalf refused to submit to a breath test.

*C. Exclusion of the OCD Evidence*

Medcalf asserts that (1) RCW 46.20.308 does not require license revocation when a driver wants to take a breath test, but is unable to take it because of OCD; (2) the physical nature of OCD prohibits exclusion of evidence that OCD prohibited Medcalf from taking the breath test; and (3) the exclusion of the OCD evidence that he was unable to take the breath test violated his due process right to a meaningful opportunity to be heard.

---

[3]RCW 46.61.506 describes the specific requirements for breath and blood testing evidence.

■■ A mental condition is not a condition under which a person is deemed to have consented in RCW 46.20.308(4), nor is it considered "a condition rendering [a driver] . . . incapable of refusal." *See Gibson v. Department of Licensing*, 54 Wn. App. 188, 191-93, 773 P.2d 110 (manic depressive mental condition did not make driver incapable of refusing test; incapacity to take test is shown only when physical conditions clearly appear to prevent driver from responding to officer's request), *review denied*, 113 Wn.2d 1020 (1989). Therefore, the existence of a mental condition is not a defense for refusal to take a breath test. *Gibson*, 54 Wn. App. at 191-93. This is because the officer must have a reasonable basis by which to ascertain whether the condition asserted exists, regardless of whether the condition is voluntary or involuntary. *Steffen v. Department of Licensing*, 61 Wn. App. 839, 847, 812 P.2d 516 (1991).

■■ In construing RCW 46.20.308(4), the court has focused on the officer's reasonable perceptions of the driver: "[the officer] does not have to 'guess' what the driver's mental capacity, in fact, is." *Nettles v. Department of Licensing*, 73 Wn. App. 730, 733, 870 P.2d 1002 (1994). "[T]he implied consent law does not require that the driver make a knowing and intelligent decision to refuse the test; it only requires that the driver have the opportunity to exercise an informed judgment." *Nettles*, 73 Wn. App. at 733 (citing *Gibson*, 54 Wn. App. at 195 (citing *Department of Motor Vehicles v. McElwain*, 80 Wn.2d 624, 628, 496 P.2d 963 (1972)).

In *Nettles*, the court held that evidence was sufficient to show that the driver had the opportunity to make an informed decision while talking and responding to the officer's questions, was fully advised of constitutional rights and refused to waive them, and was advised of implied consent rights and refused to take a blood test. *Nettles*, 73 Wn. App. at 733. No showing of mental capacity was required. *Nettles*, 73 Wn. App. at 734.

In this case, the evidence indicated that Medcalf was read his constitutional rights and invoked his right to

remain silent, requested and spoke with an attorney, and was read his implied consent rights. Medcalf was given the opportunity to make an informed decision, and he did not respond; thus, under *Nettles*, the jury properly found that Medcalf refused to take the test.

More importantly, under *Gibson*, Medcalf's testimony regarding OCD was irrelevant to whether he was given the opportunity to refuse to take the test. The trial court therefore did not abuse its discretion in excluding such evidence.

Medcalf argues, however, that cases such as *Gibson* construe only subsection (4) of RCW 46.20.308, and are inapplicable to his challenge under subsections (7) and (8). Analyzing the structure of the statute, Medcalf argues that subsection (4) guides officers in determining whether to administer a breath test, a blood test, or no test at all. By contrast, subsections (7) and (8) guide the Department in holding hearings, and specify that defendants may present evidence regarding whether they refused to consent. Medcalf argues the trial court erred in applying the "broad language" of *Gibson* and other "subsection (4)" cases to exclude evidence in a subsection (7) hearing. He correctly notes that the trial court in *Gibson* allowed the testimony regarding insanity, but (as trier of fact) found it unpersuasive and irrelevant under subsection (4).

In interpreting a statute, we must construe the act as a whole, giving effect to all of the language used and harmonizing the provisions, if possible, to ensure proper construction of all of the provisions. *State v. Young*, 125 Wn. 2d 688, 696, 888 P.2d 142 (1995); *see also State v. S.P.*, 110 Wn.2d 886, 890, 756 P.2d 1315 (1988). The intent of RCW 46.20.308 is to provide an officer in the field with guidance regarding the behavior that constitutes refusal to take the breath test, not to provide a driver with a second chance to explain a refusal to take the test at a later hearing. It would be inconsistent for us to hold that such evidence is admissible at trial on the issue of whether a driver refused to take the test, when we have held that

mental disorders, which are not physically visible to a police officer, cannot be a defense for the refusal to take a breath test.

■■ Because there was no physical evidence that Medcalf was unable to take the breath test, Medcalf's failure to respond to Officer Giuntoli's instructions on taking the test was properly deemed a refusal to take the test. The State correctly points out that Medcalf's failure to give a response while he sat at the breath machine constituted a refusal because (1) he was given the opportunity to respond and (2) OCD, as a mental condition, was irrelevant to his capacity to refuse the test.

The implied consent statute does not define refusal, nor does it give a driver a specific time within which to submit to the test; therefore, we give " 'refusal' " its ordinary meaning: " 'to show or express a positive unwillingness to do or comply with (as something asked, demanded, expected) . . . .' " *Lax*, 125 Wn.2d at 822 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1910 (1986)). Thus, unwillingness to comply with the request to take the breath test is a refusal. *See Wolf v. Department of Motor Vehicles*, 27 Wn. App. 214, 217, 616 P.2d 688 (1980) (evidence supported trial court finding that driver, who claimed that plug of tobacco plugged machine, did not cooperate in taking test, even though whether conduct amounts to a refusal is a fact question); *Woolman v. Department of Motor Vehicles*, 15 Wn. App. 115, 117-18, 547 P.2d 293 (1976) (inability to produce sufficient air to activate machine, without evidence supporting inability, deemed refusal to take test).

The implied consent statute requires only that a driver be given the opportunity to exercise intelligent judgment, if capable of doing so. *McElwain*, 80 Wn.2d at 628. When a driver is conscious, is read the appropriate rights, and does not respond, the driver has refused. *McElwain*, 80 Wn.2d at 628 (driver conscious, but incoherent, who did not respond to request to take test deemed to have refused); *Junkley v. Department of Motor Vehicles*, 7 Wn.

App. 827, 830-31, 503 P.2d 752 (1972) (degree of intoxication from drugs and alcohol irrelevant, provided driver given the opportunity to submit to test). Moreover, when a driver is conscious, is read the implied consent warnings, and is given the opportunity to speak to an attorney, his or her refusal to respond to the request to take the test is also a refusal to take the test. *Department of Motor Vehicles v. Riba*, 10 Wn. App. 857, 861, 520 P.2d 942 (1974). Thus, Medcalf's failure to respond to Officer Giuntoli's request that he take the breath test was a refusal to take the test, after he was read his constitutional and implied consent rights and was given the opportunity to consult with an attorney.[4]

Medcalf also contends that after the trial court excluded the OCD testimony, the trial became a "farce" because he was permitted to testify only that he was unable to take the test without explaining the reason, thus being deprived of due process. Contrary to Medcalf's assertion, *Gibson* holds that due process requires only that Medcalf have notice and an opportunity to be heard. *Gibson*, 54 Wn. App. at 194-95. Due process does not require that Medcalf be given the opportunity to explain a mental condition that cannot be a defense for his refusal to submit to the breath test. *Gibson*, 54 Wn. App. at 194-95. The trial court did not abuse its discretion in excluding the OCD evidence.

### D. Exclusion of the Acquittal Evidence

Medcalf also asserts that the trial court abused its discretion in excluding evidence of his acquittal for the DWI because (1) it was the only evidence indicating that he wanted to take the breath test to prove that he was sober and (2) it supported his argument that Officer Giuntoli was biased against him because of the outcome of the prior DWI proceeding.

---

[4]Medcalf cites cases from other jurisdictions in which drivers have defended against license revocations by showing that breathing problems prevented them from submitting a sufficient breath sample. Unlike those cases, Medcalf produced no evidence that he conveyed his willingness to take the test to the officer. Further, he admits he did not attempt to take the test.

■ ■ Evidence of an acquittal for DWI is not relevant in a license revocation proceeding for violation of the implied consent law. *Brewer v. Department of Motor Vehicles*, 23 Wn. App. 412, 415, 595 P.2d 949 (1979); *Fritts v. Department of Motor Vehicles*, 6 Wn. App. 233, 241, 492 P.2d 558 (1971).

In addition, evidence of the DWI acquittal does not show Officer Giuntoli's bias. Medcalf appears to assert that Officer Giuntoli's testimony at the DWI proceeding could show bias; however, that testimony is not in the record before this court. We will not consider an argument on appeal that is not supported by evidence in the record. *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 252, 850 P.2d 1298 (1993) (citation omitted).

Because Medcalf's DWI acquittal is irrelevant to the revocation proceeding and to the issue of Officer Giuntoli's alleged bias, the trial court did not abuse its discretion in excluding that evidence.

Affirmed.

TURNER and ARMSTRONG, JJ., concur.

Review granted at 131 Wn.2d 1005 (1997).