IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THOMAS CLARK and ALYSON CLARK, husband and wife, and the marital community composed thereof, | ) ) ) ) | No. 73125-4-I |
| Respondents, | ) ) | |
| v. | ) ) | |
| ANDELLE TENG, M.D., and CASCADE SURGERY ASSOCIATES, PLLC d/b/a CASCADE ORTHOPAEDICS, | ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) ) | FILED: June 27, 2016 |

VERELLEN, C.J. — When reviewing an order granting a new trial, we give great deference to trial court findings of misconduct but also focus on the trial court's specific reasons for the new trial. The order granting a new trial in this medical malpractice lawsuit heavily relies on inaccurate facts. The trial court also ignored its ruling expressly authorizing the defense to dispute causation by attributing a cerebrospinal fluid leak to surgeries performed by a nonparty doctor that were "not appropriate."[1] Because core examples of misconduct identified by the trial court are fatally flawed, we conclude the trial court abused its discretion. We reverse the order granting a new trial and the judgment awarding terms. We remand for reinstatement of the jury verdict.

---

[1] Report of Proceedings (RP) (Oct. 6, 2014) at 30.

## FACTS

In 2008, Thomas Clark began to have low back and leg pain. On February 1, 2010, Dr. Andelle Teng operated on Clark's low back. On February 18, Clark had a magnetic resonance imaging test (MRI). Dr. Teng reviewed the MRI and told Clark that he did not have a cerebrospinal fluid (CSF) leak. Clark sought a second opinion from Dr. Wohns. Dr. Wohns operated twice on Clark's low back. An MRI after Dr. Wohns's surgeries revealed a "large fluid collection" in his low back.[2] Clark had a fourth surgery at Harborview by a resident physician to repair a CSF leak.

Clark sued Dr. Teng and his employer for medical malpractice. Clark's theory was that Dr. Teng was negligent in performing the surgery and in failing to treat Clark's CSF leak. Dr. Teng did not plead nonparty fault.

In his motion in limine, Clark argued defense counsel "should be precluded from suggesting" that "any non-parties are at fault" or "that Dr. Wohns violated the standard of care or caused any of the injuries sustained by Mr. Clark."[3] Defense counsel agreed not to argue nonparty fault but insisted on their right to challenge causation; specifically, to argue the MRI taken soon after Dr. Teng's surgery revealed no CSF leak, but the MRI after Dr. Wohns's surgeries did:

> [T]he testimony from our experts is going to be that there was no CSF leak visible on the MRI that was taken on February 18, 2010.[4]

> Our witnesses are going to say that on February 18, 2010, there was no evidence of a CSF leak and there was no reason for . . . a surgery.[5]

---

[2] Ex. 141.

[3] Clerk's Papers (CP) at 25.

[4] RP (Oct. 6, 2014) at 27.

[5] Id. at 28.

So his second . . . Harborview surgery was necessitated only because a CSF leak occurred during Dr. Wohns' first surgery. Now, Wohns said we caused it, and we're going to say . . . the postoperative MRI doesn't show any CSF leak. The MRI after Dr. Wohns's surgery shows a big CSF leak.[6]

The court granted Clark's motion in limine about nonparty fault but expressly allowed Dr. Teng to compare and to contrast the February 18 MRI with the one taken after Dr. Wohns's surgeries and to argue that those surgeries were inappropriate:

I have no problem at all saying that the MRI of the 18th of February 2010 . . . [d]id not show any kind of a leak, and therefore surgery was not appropriate. That's fine.[7]

If Mr. Fitzer [defense counsel] limits his argument and his testimony as evidence to what he has just described, I'm okay with that. And I can still grant your motion in limine No. 4, and it falls within what both of you are saying.[8]

And, Mr. Fitzer, I will accept what you just said. You can present exactly what you've just told me you're going to present. That seems to be the gravamen of your case. And at the same time, Mr. Wampold's [Clark's counsel] motion No. 4 is granted.[9]

Clark also sought to preclude evidence of his treatment for "sleep apnea, a neck surgery, a heart stent, and a corneal replacement."[10] The court ruled defense counsel could not elicit testimony about "anything above the waist."[11] Defense counsel asked the court to clarify its ruling:

MS. FITZER: Just so that we know and don't cross over any line, are you saying for any prior medical record? Or are you just saying for the stent and for the neck?

---

[6] Id. at 31.

[7] Id. at 30.

[8] Id. at 31.

[9] Id. at 32.

[10] CP at 26.

[11] RP (Oct. 6, 2014) at 49.

COURT:     I'm saying anything above the waist. Let's put it that way.

MS. FITZER:  Anything above the waist?

MS. ALLEN:   Sleep apnea is above the waist.

COURT:     That is, yes. I can see that to be kind of nose and sinus and all of that stuff. So, yeah. But below the waist is fair game since that's why Dr. Teng saw him in the first place, I assume.

MS. FITZER:  Does that mean we cannot refer to the headache[?]

COURT:     You've got to show it's relevant. And something that happened months before, or at least a month before, is not, in my mind, relevant. But if you can give me an offer of proof during the course of the trial where you think that is relevant, I'll reconsider that. And I'll give them an opportunity to answer. It's all [ER] 403, 404. Okay. . . . [S]o I'm going to say this is granted, but in all of these motions, for both defense and plaintiffs, you can move to reopen if you follow what I just indicated.[12]

Before opening statements, the parties exchanged PowerPoint slides without objection.

Clark's counsel in opening statement foreshadowed Dr. Teng's "defenses" to the jury:

So what are the defenses? Dr. Teng will tell you that Dr. Wohns is mistaken with what he saw[, t]hat he didn't see loose bone, that there wasn't a CSF leak, and that there wasn't a compression of the thecal sac. Either that he's wrong or that he's not telling the truth. But when you hear that, ask yourself whether a 30-year neurosurgeon was wrong about those things or what incentive he would have to not tell the truth.[13]

Defense counsel responded:

The case started in 2010 when Mr. Clark reported to Dr. Teng that he had some additional problems. Now remember, from 2008, we already know, and we will see documentation to establish it, that he had problems with his upper spine that were causing symptoms in his legs. So this is

---

12 Id.

13 RP (Oct. 7, 2014) at 139.

nothing new for him. There was a preoperative MRI, which I'm going to show you in a minute, and there was a postoperative MRI, and we're going to use those in a second to explain what actually happened in this case.[14]

Mr. Clark saw Dr. Wohns on the 12th, and you've just heard that it was something—at least it sounded like an urgent or emergent situation. Well, there was no surgery by Dr. Wohns for 11 days.[15]

[T]his is what it looked like with a free spinal cord the last time Mr. Clark left [Dr.] Teng's care. . . .

Here, this is after Dr. Wohns' first and second surgeries. All of this blue is cerebrospinal fluid. It's the fluid that surrounds the brain, it surrounds the spinal cord. It's supposed to be inside the yellow tube. It's not supposed to be outside. None of that was there until after he operated the first time. Then the patient comes back, has another procedure, and the spinal fluid is—actually corroded its way out the back. That's when Dr. Wohns' nurse, not Dr. Wohns, sewed him up and sent him home.

Then, after the second operation that Dr. Wohns performs, you still have this problem, and it's much thicker. . . . That's several inches of spinal fluid after Dr. Wohns.

And then this is the MRI after the medical resident and Dr. Chesnut repair it, and there's much less. And you can see where—you'll hear testimony about the pressure caused by this CSF after the Wohns' surgery.

So there's more, as you'll hear, than just the pictures you have seen. When people have a leak as a result of back surgery or some other problem, there are symptoms. First of all, there are what we call postural headaches. So way back here, there's no postural headache. Postural headache is when you stand up and you get this bad headache, and when they lay you flat it goes away, and that's a primary sign of a CSF leak. There's no medical record that Mr. Clark had one of those. After Dr. Wohns operated, he had postural headaches for obvious reasons.[16]

---

[14] Id. at 147.

[15] Id. at 148-49.

[16] Id. at 151-53.

5

The day after opening statements, Clark alleged defense counsel's opening statement violated the order in limine. The court found defense counsel had not violated the order in limine.

Later, the court raised the question of misconduct when defense counsel asked Dr. Teng:

Q. Do you remember when you first met Mr. Clark?

A. I do.

Q. And tell us what you remember about your very first meeting with him.

A. That is a different reason that I'm . . .

Q. I understand. Were there any low back problems involved at that earlier meeting?

A. No, there wasn't.

Q. All right. When did you first meet him in regard to his low back?

A. In 2010.[17]

The court noted this questioning was "very close to a violation of that order in limine."[18]

Defense counsel referred to headaches and sleep apnea when questioning expert witness Dr. Nitin Bhatia. Clark did not contemporaneously object, but later alleged defense counsel violated the order in limine by eliciting testimony about Clark's preexisting medical conditions "above the waist":

Q. Okay. Now, turning to Exhibit No. 115, are those Dr. Teng's progress notes as he is following the patient in the hospital?

A. Yes.

---

[17] RP (Oct. 15, 2014) at 804.

[18] RP (Oct. 16, 2014) at 857-58. The trial court later found this incident to be an actual violation of the order in limine. See RP (Oct. 20, 2014) at 1133-34.

Q. Okay. In reviewing those, first of all, is there any indication that this patient had a headache?

A. There was an indication . . .

Q. If you turn to page 84.

A. Page—yeah. Here it is. I was trying to find where I'd seen it. On February 2nd, which is the day after surgery, and he woke up with a headache, thinks it's because his CPAP was broken and he had to use BiPAP. And those are machines you use for sleep apnea, and they strap around the head and help you breathe if you have, if you have sleep apnea.[19]

The court ultimately found defense counsel's questions violated the order in limine.

Plaintiff's exhibits included medical records that Dr. Teng had seen Clark "in the past for cervical problems,"[20] and that Clark had complained "of sleep apnea, CPAP machine."[21]

Near the end of trial, Clark alleged defense counsel had repeatedly violated the order in limine and requested a default judgment. The trial court discussed three violations of the order in limine: defense counsel's opening statement, the testimony of Dr. Teng that he had previously seen Clark unrelated to his back injury, and the reference to headaches associated with the sleep apnea device. The court denied a default judgment, but reserved ruling on another remedy.

After closing arguments, Dr. Teng moved for a mistrial, alleging violations of the consolidated order granting motions in limine. The court denied a mistrial:

In terms of Dr. Wohns, the clear inference of the testimony presented by the defense through their experts and through Dr. Teng was that Dr. Wohns was inaccurate and not forthright in his testimony and what he said

---

[19] RP (Oct. 20, 2014) at 1086-87.

[20] Ex. 1 at 15.

[21] Ex. 3 at 9.

7

to the jury and what he told people he found during the course of his first surgery. I think you would have had to have been asleep to not get that clear inference. . . .

. . . It's for the jury to decide on Dr. Wohns's credibility, just as they have to decide on every witness's credibility. It's for them to decide whether or not he was accurate in his description of what he found after his first surgery, and in what he did and in his opinions. And that's just like every other witness.[22]

And as far as inappropriate argument, I think that when you have a highly-contested case, as this was, both sides push the boundaries. Both sides pushed the boundaries in this matter. We argued during the first week that Mr. Fitzer pushed the boundaries in his opening statement. There was a brief that counsel wrote that I reread again last night about how Mr. Fitzer had violated my order in limine. . . . I think that both sides pushed the boundaries as much as they felt they could. But I refuse to find that either side went over those boundaries to the point where a mistrial is warranted.[23]

The jury returned a defense verdict. Clark filed a motion for new trial, claiming defense counsels' repeated violations of the order in limine warranted a new trial. At the hearing, the court found defense counsel "especially violated pretrial orders" during trial.[24] The court granted Clark's motion for new trial, concluding the cumulative effect of defense counsels' misconduct clearly casts doubt on whether a fair trial occurred. The court awarded Clark $82,131.65 in sanctions against defense counsel.

Dr. Teng appeals.

## ANALYSIS

"We review a trial court's grant of a new trial for abuse of discretion unless that grant is based on an error or law."[25] Dr. Teng argues we should review the new trial

---

[22] RP (Oct. 22, 2014) at 1570-71.

[23] Id. at 1573.

[24] RP (Dec. 19, 2014) at 1586-87.

[25] Teter v. Deck, 174 Wn.2d 207, 215, 274 P.3d 336 (2012).

8

order de novo because the trial court based its decision on an "error of law," namely, the admissibility of evidence.[26] But the evidentiary rulings underlying the order in limine, including arguably drawing a line between evidence of nonparty fault and causation, all involve discretionary rulings.[27] The trial court exercised its discretion in granting a new trial based upon defense counsel's conduct during trial. Abuse of discretion standard applies.

A trial court has "broad discretion" in granting a motion for new trial.[28] We require a "much stronger showing of abuse of discretion to set aside an order granting a new trial than one denying a new trial."[29] The trial court is "in the best position" to gauge the prejudicial impact of counsels' conduct on the jury.[30] Particularly when the grounds for a new trial involve the assessment of misconduct during the trial and its potential effect on the jury, we will give the trial court's order and findings of misconduct "great deference."[31] We are also mindful not to "substitute our own judgment for the trial court's judgment in evaluating the scope and effect of that misconduct."[32]

---

[26] Appellant's Reply Br. at 1; see also CR 59(a)(8).

[27] Mutual of Enumclaw Ins. Co. v. Gregg Roofing Co., 178 Wn. App. 702, 728, 315 P.3d 1143 (2013) (evidentiary rulings reviewed for abuse of discretion); Garcia v. Providence Med. Ctr., 60 Wn. App. 635, 642, 806 P.2d 766 (1991) (ruling on a motion in limine reviewed for abuse of discretion).

[28] Bunnell v. Barr, 68 Wn.2d 771, 775, 415 P.2d 640 (1966).

[29] Teter, 174 Wn.2d at 222.

[30] Taylor v. Cessna Aircraft Co., Inc., 39 Wn. App. 828, 832, 696 P.2d 28 (1985).

[31] Levea v. G.A. Gray Corp., 17 Wn. App. 214, 226, 562 P.2d 1276 (1977); see also Teter, 174 Wn.2d at 223.

[32] Teter, 174 Wn.2d at 226.

Analyzing an order granting a new trial "is generally limited to the trial court's reasons for granting a new trial."[33] Those reasons must "adequately support its order."[34] A trial court abuses its discretion only if its decision is manifestly unreasonable or based on untenable grounds or reasons.[35] But a trial court that "relies on unsupported facts"[36] or "a clearly erroneous assessment of the evidence"[37] necessarily abuses its discretion. It is also untenable if a trial court ignores its own prior rulings when finding misconduct.[38]

The order granting Clark a new trial focused upon alleged violations of the consolidated order on motions in limine.[39] A new trial may be granted when a prevailing party's misconduct materially affects the other party's substantial rights.[40] But the trial court's reasoning is flawed in several respects.

---

[33] Cox v. Gen. Motors Corp., 64 Wn. App. 823, 826, 827 P.2d 1052 (1992).

[34] Storey v. Storey, 21 Wn. App. 370, 373, 585 P.2d 183 (1978).

[35] Gildon v. Simon Property Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006).

[36] Id.

[37] Demelash v. Ross Stores, Inc., 105 Wn. App. 508, 530, 20 P.3d 447 (2001).

[38] See generally West v. Dep't of Licensing, 182 Wn. App. 500, 516-17, 331 P.3d 72 (2014) ("A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; and it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard."); Reidelberger v. Highland Body Shop, Inc., 83 Ill.2d 545, 553, 416 N.E.2d 268 (Ill. 1981) ("Granting a new trial because of conduct of counsel which did not violate the original in limine order and because of what the court in retrospect perceived to be violations of rulings made during the trial, which the record reveals were neither clear nor consistent, constitutes a clear abuse of discretion.").

[39] CP at 473, ¶ 6.

[40] CR 59(a)(2).

First, the trial court heavily relied upon inaccurate facts and ignored its rulings authorizing defense counsel to question causation by attributing the CSF leak to Dr. Wohns's inappropriate surgeries.[41]

The trial court granted Clark's motion in limine to preclude any suggestion of fault or causation by nonparties, including Dr. Wohns. At the same time, the court clarified that defense counsel could argue "the postoperative MRI [did not] show any CSF leak" but the "MRI after Dr. Wohns's surgery show[ed] a big CSF leak" because that is the "gravamen" of Dr. Teng's case.[42] Defense counsel disclosed that their witnesses would testify that "on February 18, 2010, there was no evidence of a CSF leak and there was . . . no need for a surgery."[43] The court responded, "I have no problem at all [with you] saying that the MRI of the 18th of February 2010 . . . [d]id not show any kind of a leak, and therefore surgery was not appropriate. That's fine."[44]

In its order granting a new trial, the court expressed concern with the defense theme that "any injuries sustained by [Clark] were caused by Dr. Wohns."[45] But the specific examples cited in the order are factually inaccurate. The order recites that in opening statement, defense counsel "clearly stated that Dr. Wohns was at fault and caused the problems [Clark] now suffers."[46] The order also purports to quote from

---

[41] It appears the trial court may have relied upon factual inaccuracies in Clark's earlier motion objecting to defense counsel's opening statement. Compare CP at 473, ¶ 6, with CP at 244-45.

[42] RP (Oct. 6, 2014) at 31-32.

[43] Id. at 28.

[44] Id. at 30.

[45] CP at 474, ¶ 6.

[46] Id. at 473, ¶ 6.

defense counsel's opening statement, when comparing the MRIs, that defense counsel "specifically stated that 'this is what it looked like when he was under Dr. Teng's care' and 'this is what Dr. Wohns did to him' and 'the result of Dr. Wohns' care is this.'"[47] But defense counsel made no such statements. Defense counsel actually argued:

> There was a preoperative MRI, which I'm going to show you in a minute, and there was a postoperative MRI, and we're going to use those in a second to explain what actually happened in this case.[48]

> [T]his is what it looked like with a free spinal cord the last time Mr. Clark left [Dr.] Teng's care. . . . Here, this is after Dr. Wohns' first and second surgeries. All of this blue is cerebrospinal fluid. It's the fluid that surrounds the brain, it surrounds the spinal cord. It's supposed to be inside the yellow tube. It's not supposed to be outside. None of that was there until after he operated the first time. Then the patient comes back, has another procedure, and the spinal fluid is—actually corroded its way out the back. That's when Dr. Wohns' nurse, not Dr. Wohns, sewed him up and sent him home.

> Then, after the second operation that Dr. Wohns performs, you still have this problem, and it's much thicker. . . . That's several inches of spinal fluid after Dr. Wohns.

> And then this is the MRI after the medical resident and Dr. Chesnut repair it, and there's much less. And . . . you'll hear testimony about the pressure caused by this CSF after the Wohns' surgery.

> So there's more, as you'll hear, than just the pictures you have seen. When people have a leak as a result of back surgery or some other problem, there are symptoms. First of all, there are what we call postural headaches. So way back here, there's no postural headache. Postural headache is when you stand up and you get this bad headache, and when they lay you flat it goes away, and that's a primary sign of a CSF leak. There's no medical record that Mr. Clark had one of those. After Dr. Wohns operated, he had postural headaches for obvious reasons.[49]

---

[47] Id.

[48] RP (Oct. 7, 2014) at 147.

[49] Id. at 151-53.

The order also criticizes the defense PowerPoint slides: "The only purpose of utilizing these comparative slides was to show that Dr. Wohns had done something improper in his surgery."[50] But the trial court's pretrial ruling expressly authorized defense counsel to compare and contrast the MRI images included in the PowerPoint slides. Clark's counsel also reviewed those slides before opening statements and expressly advised the court there would be no objections during opening that the slides showed something that they had not agreed to show.[51]

Clark argues defense counsels' opening statement implied fault by Dr. Wohns. But the mere mention of Dr. Wohns's name when comparing the MRI images did not imply a breach of the standard of care. And the mere fact of postoperative complications with no evidence of a breach of the standard of care does not imply fault. The trial court expressly authorized the defense to compare the MRI images and contend that Dr. Wohns's surgeries were not appropriate.

Second, the court's order indicates that defense counsel improperly insinuated in opening statement that Dr. Wohns violated the standard of care by suggesting he allowed a nurse to stitch up and release Clark and that even a student doctor was able to fix a problem that Dr. Wohns did not fix. The specific statements in opening were:

> Then the patient comes back [to Dr. Wohns], has another procedure, and the spinal fluid is—actually corroded its way out the back. *That's when Dr. Wohns's nurse, not Dr. Wohns, sewed him up and sent him home.*[52]

---

[50] CP at 473, ¶ 6.

[51] Additionally, Clark's counsel did not object before or during the opening statement.

[52] RP (Oct. 7, 2014) at 152 (emphasis added).

13

> And then *this is the MRI after the medical resident and Dr. Chesnut repair it*, and there's much less. And you can see where you'll hear testimony about the pressure caused by this CSF after the Wohns's surgery.[53]

The trial court noted that these comments were examples of the defense theme that "any injuries sustained by the plaintiff were caused by Dr. Wohns, not the defendant."[54] But Clark does not contend that the defense statements about the assistant and resident were factually inaccurate. Nor did Clark timely object to statements about the assistant and the resident. And in condemning the defense theme that Dr. Wohns caused the injuries, the court did not reconcile or even mention its prior ruling authorizing the defense to contest causation, to dispute that Dr. Teng caused the injury, and to argue that Dr. Wohns's surgeries were not appropriate. Further, the trial court did not identify the references to the assistant and resident as independent acts of misconduct that alone would support a new trial. We cannot ignore the factual inaccuracies in the key examples of misconduct identified by the trial court, or the trial court's ruling authorizing the defense causation theory that Dr. Wohns's surgeries were inappropriate. In this setting, counsel's alleged insinuations of fault are not tenable reasons for a new trial.

Third, the order granting a new trial refers to violations of the "above the waist" limitation, "although to a much lesser extent than the accusations against Dr. Wohns."[55] The order specifically refers to defense counsel's opening statement regarding "Clark's prior medical conditions 'above the waist', contrary to the Court's prior rulings."[56] But

---

[53] Id. (emphasis added).

[54] CP at 473-74, ¶.6.

[55] Id. at 474, 8.

[56] Id.

defense counsel merely told the jury in opening about Clark's 2008 "problems with his upper spine that were causing symptoms in his legs."[57] Leg problems are 'below the waist' symptoms. Dr. Teng acknowledges that eliciting testimony about headaches related to the sleep apnea machine Clark used while in the hospital without first obtaining the trial court's approval was a violation of the "above the waist" limitation, but contends there was no prejudice. Clark, on the other hand, notes that we must give great deference to the trial court's finding of prejudice.

While we grant "great deference" to the trial court on the scope of misconduct and resulting prejudice, it is not absolute deference. In this case, the court's finding of prejudice is contrary to the record. Specifically, the plaintiff's exhibits included express statements that Dr. Teng had seen Clark "in the past for cervical problems"[58] and that Clark complained "of sleep apnea, CPAP machine."[59] Even under the deferential standard for reviewing prejudice, Clark cites no authority that prejudice exists when the same testimony alleged to be defense misconduct is also before the jury in the form of a plaintiff's exhibit. Clark's sleep apnea and Dr. Teng's prior treatment of Clark for conditions unrelated to his low back problem were before the jury in Clark's exhibits. It was an abuse of discretion to conclude that the same information prejudiced the outcome of this trial.

Fourth, Clark offers numerous other illustrations of alleged misconduct. But in applying the abuse of discretion standard, we are focused on the trial court's reasons for a new trial. The trial court referred to a defense theme, but did not incorporate,

[57] RP (Oct. 7, 2014) at 147.
[58] Ex. 1 at 15.
[59] Ex. 3 at 9.

adopt, or allude to other specific alleged acts of misconduct listed in the motion for new trial. Clark offers no authority requiring us to speculate what other alleged acts of misconduct the trial court did or did not rely upon.

Finally, the order granting a new trial recites that in closing "[d]efense counsel continued with his theme of non-party fault."[60] The order does not identify any particular examples. Parts of the defense closing argument did point to limited testing and documentation by Dr. Wohns, Clark's postural headaches only after Dr. Wohns's surgeries, and that "someone else's surgeries on two occasions failed."[61] But the defense closing argument also expressly disclaimed any theory of nonparty fault:

> If Dr. Wohns takes him down a different path, and that path causes his problems, then it's not Dr. Teng's fault. You can have cause without fault. We didn't come here to play the blame game, but we did come here to show you, as part of our obligation, that things which were done after the 18th were the cause of his current symptoms. And that's the whole point.[62]

> [A]nd he had a bunch of problems related to a surgery that several doctors wouldn't have performed, wasn't negligent, but it did cause his problem.[63]

In this setting, absent any indication by the trial court of specific examples of misconduct in closing argument, a general reference in the order granting new trial is not compelling.

## CONCLUSION

The order granting a new trial heavily relies upon inaccurate facts and ignores the trial court's ruling authorizing the defense to challenge causation by attributing

---

[60] CP at 475, ¶11.

[61] RP (Oct. 22, 2014) at 1540.

[62] Id. at 1539.

[63] Id. at 1543.

Clark's injuries to inappropriate surgeries by Dr. Wohns. These inaccuracies and inconsistencies in the new trial order call into doubt the trial court's reliance upon a theme of misconduct. We conclude the trial court abused its discretion in ordering a new trial. We reverse both the trial court's order granting a new trial and the judgment awarding terms to Clark. We remand for reinstatement of the jury verdict.

_____

Becker, J.

WE CONCUR:

_____

Trickey, J.