FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 APR 30 AM 9: 09

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | |
|---|---|
| RONNIE LEE SHARP, as Administrator )<br>of the Estate of Saundra Sharp, )<br>deceased, )<br>                )<br>        Respondent, )<br>                )<br>      v.            )<br>                )<br>LIFE CARE CENTERS OF AMERICA, )<br>INC., a Tennessee corporation, )<br>CASCADE MEDICAL INVESTORS )<br>LIMITED PARTNERSHIP, a Tennessee )<br>entity d/b/a LIFE CARE CENTER OF )<br>PORT TOWNSEND, )<br>                )<br>        Appellants. )<br>_____ ) | No. 77747-5-I<br><br><br><br><br><br><br><br><br>UNPUBLISHED OPINION<br><br>FILED: April 30, 2018 |

VERELLEN, J. — Life Care Center, a nursing facility, appeals the trial court's grant of a new trial following a defense verdict. The court found multiple discovery violations and several instances of defense counsel misconduct. The court concluded either the combined discovery abuses or combined misconduct supported granting a new trial.

There are serious concerns. First, the trial court did not make its decision until more than a year after the parties completed briefing on the motion for new trial, the parties provided only limited excerpts of the actual proceedings, and several of the trial court's findings are inaccurate. Second, in some instances, the

trial court did not reconcile its new trial findings with its inconsistent rulings and observations during trial. Third, the court emphasized the willful and malicious misconduct by defense counsel but relied on events implicating only Life Care itself. Fourth, the trial court ignored the doctrine of waiver as it applies to a request for a new trial. And finally, the trial court failed to apply the correct standard of prejudice. Contrary to the trial court's theme, there is no pattern of malicious attorney misconduct or egregious discovery abuses.

We reverse.

## FACTS

From September 17, 2012 to October 17, 2012, Saundra Sharp resided at Life Care Center in Port Townsend. While at Life Care, Saundra developed cellulitis, an infection, in her lower legs. She was transferred to Jefferson County Hospital, where she died from sepsis on October 21, 2012.

Ronnie Sharp, as administrator of Saundra's estate (Sharp), filed a wrongful death action and alleged the facility was negligent in their failure to treat Saundra while the infection was survivable and by understaffing the facility. Life Care denied these claims. The trial began on November 10, 2014. Following a 35-day trial, the jury returned a defense verdict.

On February 9, 2015, Sharp filed a motion for new trial. The court held a hearing on March 23, 2015. After the hearing, the court requested supplemental briefing, which the parties provided in May 2015. A year later, on June 6, 2016, the trial court issued a memorandum opinion granting a new trial. On October 5,

2016, the court issued detailed findings of fact and conclusions of law. The court also awarded Sharp fees and costs associated with the original trial.

Life Care appeals.

## ANALYSIS

### I. Motion for New Trial

Life Care contends the trial court abused its discretion when it granted a new trial. Life Care assigns error to almost every finding in the trial court's lengthy memorandum opinion and subsequent findings of fact and conclusions of law. As to several findings, Life Care contends the trial court abused its discretion by relying on inaccurate facts. There are significant factual inaccuracies in the trial court's findings. We are troubled with the trial court's ability to accurately recall the details of the 35-day trial without access to the full record. The parties submitted limited transcript excerpts, and the trial court appears to have heavily relied on the clerk's minute entries. We are especially concerned about the accuracy of the trial court's recollection because of the extreme delay between the motion in February 2015 and the trial court's decision in June 2016.

We review a trial court's grant of a new trial for abuse of discretion.[1] "A much stronger showing of abuse of discretion is required to set aside an order granting a new trial than one denying a new trial."[2] "A court abuses its discretion

---

[1] Palmer v. Jensen, 132 Wn.2d 193, 197, 937 P.2d 597 (1997).

[2] Hollins v. Zbaraschuk, 200 Wn. App. 578, 580, 402 P.3d 907 (2017), review denied, 189 Wn.2d 1042 (2018).

when it makes a decision for untenable reasons or on untenable grounds."[3] "A court's decision is based on untenable grounds if the factual findings are not supported by the record; the decision is based on untenable reasons if it is based on an incorrect standard."[4] "It is also untenable if a trial court ignores its own prior rulings when finding misconduct."[5]

Our analysis of an order granting a new trial "'is generally limited to the trial court's reasons for granting a new trial.'"[6] Here, the trial court granted a new trial based on defense counsel's misconduct and Life Care's discovery violations.

As to misconduct, the court relied on CR 59(a)(2). Notably, some of the instances of misconduct referenced by the court were not the actions of defense counsel, but rather Life Care itself. CR 59(a)(2) allows a new trial due to the "[m]isconduct of the prevailing party." But here, the trial court expressly attributed misconduct solely to the actions of defense counsel. The party seeking a new trial based on counsel's misconduct must establish that (1) the conduct was misconduct, (2) the misconduct was prejudicial, (3) the misconduct was objected to at trial, and (4) the misconduct was not cured by the court's instructions.[7]

---

[3] Id. at 582-83.

[4] Teter v. Deck, 174 Wn.2d 207, 220, 274 P.3d 336 (2012).

[5] Clark v. Teng, 195 Wn. App. 482, 492, 380 P.3d 73 (2016), review denied, 187 Wn.2d 1016 (2017).

[6] Id. (quoting Cox v. Gen. Motors Corp., 64 Wn. App. 823, 826, 827 P.2d 1052 (1992)).

[7] Aluminum Co. of America v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 539, 998 P.2d 856 (2000) (quoting 12 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 59.13[2][c][I][A], at 59-48 to 59-49 (3d ed. 1999)).

The trial court also failed to apply the correct prejudice standard required for a new trial. The trial court relied heavily on Gammon v. Clark Equipment Co. to support a new trial based on discovery abuse.[8] In Gammon, this court acknowledged a new trial is a potential remedy for discovery abuse.[9] An issue at trial was whether an equipment manufacturer had any prior notice of injuries incurred in the use of its product. The manufacturer failed to produce two "accident books" containing reports of prior accidents.[10] This court ordered a new trial for the discovery abuse.

Gammon contains an expansive statement about the level of prejudice adequate to grant a new trial for discovery violations:

> It may very well be that timely answers to the interrogatories and production of the accident reports would have made no difference. That is not for us to decide. It is precisely because we cannot know what impact full compliance would have had, that we must grant a new trial.[11]

But the court made this statement in the context of the manufacturer's failure to produce its accident books that inherently went to the material question of whether the manufacturer had notice of injuries from prior accidents.

Here, it appears the trial court interpreted Gammon as allowing a new trial on the vague and general supposition that a discovery violation has an unknowable impact on the moving party's right to a fair trial. In the memorandum

---

[8] 38 Wn. App. 274, 686 P.2d 1102 (1984).

[9] Id. at 277.

[10] Id. at 279-82.

[11] Id. at 282.

opinion granting a new trial, the court provided the following quote from United States Secretary of Defense Donald Rumsfeld: "'[A]s we know there are known knowns; there are things we know we know. We also know there are known unknowns; that is to say we know there are some things we do not know. But there are also unknown unknowns—the ones we don't know we don't know.'"[12] The court stated, "This quote aptly summarizes the gravamen of the Plaintiff's Motion for New Trial following a jury verdict for the Defense."[13] It appears the court misapprehended Gammon and assumed the existence of prejudice without conducting the proper analysis.

In Collings v. City First Mortgage Services LLC, this court determined that regardless of the specific ground, "for a trial court to grant a party's motion for new trial, prejudice is required."[14] And CR 59(a) allows a trial court to order a new trial when there is a material effect on the substantial rights of a party. In Teter v. Deck, our Supreme Court determined prejudice to a party's right to a fair trial qualifies as a material effect.[15] In Pulcino v. Federal Express Corp., this court acknowledged a new trial under CR 59(a) was consistent with FedEx's discovery abuses, which "made it *extremely difficult* for Pulcino to access the information she needed to develop her claim."[16]

---

[12] CP at 3069 (quoting from a February 12, 2002 Department of Defense news briefing).

[13] Id.

[14] 177 Wn. App. 908, 920, 317 P.3d 1047 (2013).

[15] 174 Wn.2d 207, 220, 274 P.3d 336 (2012).

[16] 94 Wn. App. 413, 428-29, 972 P.2d 522 (1999) (emphasis added).

Gammon merely acknowledges that the precise impact of a discovery violation is elusive. Consistent with Collings, Teter, and Pulcino, a trial court granting a new trial based on a discovery violation must find actual prejudice in the form of a material effect on the right to a fair trial. A party's discovery abuse has a material effect if it makes it "extremely difficult" for the other party to access information necessary to develop a claim.

"When the new trial motion challenges the effect on the jury of events occurring during trial, we must accord considerable deference to the trial court."[17] As a result, we grant great deference to a court's finding of prejudice in the area of misconduct.[18] Similarly, we give great deference to the court's finding of prejudice for discovery violations. But such deference does not allow a trial court to grant a new trial on the mere speculative and unknown impact of any act of misconduct or discovery abuse.

In this case, the trial court rarely entered individualized findings of prejudice. The court did generally conclude Life Care "engaged in willful violations of discovery and obfuscation that unfairly disadvantaged the Plaintiff in its ability to obtain all relevant information in a coherent and orderly fashion before trial" and these willful violations "unfairly prejudiced the Plaintiff and prevented a fair trial."[19] We consider the court's general determination that Life Care's discovery violations

---

[17] Taylor v. Cessna Aircraft Co., Inc., 39 Wn. App. 828, 831, 696 P.2d 28 (1985).

[18] Clark, 195 Wn. App. at 497.

[19] CP at 3241.

prevented a fair trial in the context of each of the alleged instances of misconduct and discovery abuse.

A. *Dr. von Preyss-Friedman*

Life Care first assigns error to the trial court's findings concerning the testimony of Dr. Sabine von Preyss-Friedman, a defense expert. The trial court found Life Care committed "malicious" discovery abuse because Dr. von Preyss-Friedman violated the orders in limine, despite repeated clarifications, "ringing the bell a second time."[20] The court also found the violation constituted defense attorney misconduct.

On November 24, 2014, the court prohibited Dr. Benjamin Starnes, one of Life Care's experts, from "providing any kind of a prediction of the date of death or that [Saundra] had within 30 days to live."[21] The court also precluded Dr. Starnes from rendering an opinion that "the infection could not have been treated successfully."[22] Dr. Starnes was allowed to "say [Saundra] had a poor prognosis" and he was allowed to testify "about the bodily systems within the body that were affected by her vascular disease."[23]

On December 9, 2014, the court entered two orders in limine concerning Dr. von Preyss-Friedman. First, the court prohibited Dr. von Preyss-Friedman "from parroting, echoing, referencing, or repeating Dr. Starnes's opinion *regarding*

---

[20] CP at 3228, 3237.

[21] Report of Proceedings (RP) (Nov. 24, 2014) at 2220.

[22] Id.

[23] Id. at 2221.

*Mrs. Sharp's life expectancy.*"[24] The court also precluded Dr. von Preyss-Friedman from offering "cumulative testimony *regarding the life expectancy of Mrs. Sharp,* as defense expert Dr. Starnes already offered extensive testimony regarding his opinion on this issue."[25]

In its new trial findings, the court points to two instances where Dr. von Preyss-Friedman violated the court's orders. First, on December 10, 2014, the court clarified that Dr. von Preyss-Friedman could say that Saundra's "prognosis was very poor" and that Saundra was at "end of life stages," but she could not express an opinion "as far as how much longer [Saundra] had to live."[26] Then, during direct examination, the defense attorney asked Dr. von Preyss-Friedman, "And why is it that her prognosis would be poor even if she were on IV antibiotics?"[27] Dr. von Preyss-Friedman answered, "I am a physician who, by nature, looks at the whole patient. And there's such a thing as futility and so on. So I look at the whole patient."[28] Sharp immediately objected and argued that Dr. von Preyss-Friedman's testimony concerning futility violated the court's orders in limine. Sharp also objected because the opinion was not previously disclosed.

After reviewing Dr. von Preyss-Friedman's expert witness disclosure, the court struck the answer because it was not previously disclosed, but did not

---

[24] CP at 919 (emphasis added).

[25] Id. (emphasis added).

[26] RP (Dec. 10, 2014) at 3483.

[27] Id. at 3514.

[28] Id.

explicitly address whether the testimony concerning futility of antibiotics violated the specific orders in limine.

At oral argument before this court, Sharp argued the December 10 testimony violated the general order prohibiting undisclosed expert opinions. But the trial court findings rely solely on Dr. von Preyss-Friedman's violation of the specific orders concerning her opinion about Saundra's life expectancy.

As to this first violation, the findings are not supported by the record. Neither the specific orders nor the court's clarifications prior to Dr. von Preyss-Friedman's December 10 testimony prohibited her from discussing futility of antibiotic treatment. The court's limitation on Dr. Starnes's opinion that Saundra's infection could not be successfully treated was never extended to Dr. von Preyss-Friedman. And the record reveals that Dr. von Preyss-Friedman did not testify about futility after December 10, 2014.

Second, on December 15, 2014, the court conducted voir dire with jury questions for Dr. von Preyss-Friedman:

> THE COURT: Another question, Dr. von Preyss-Friedman. "In your opinion, if not for the final sepsis infection, do you feel Sandy Sharp would have had another three to six months to live with all of her co-morbidities?"
>
> THE WITNESS: That's a very difficult question to answer since we don't have the crystal ball. I would say it is possible. I do feel that this patient, unfortunately, was at the end of her life. I cannot distinguish whether it would have been between three and six or less than three. . . . I just know that her chance of dying within the next . . . six months was more than 50 percent. . . . [I]f that had been my

10

patient, I would not have been surprised if she had passed away fairly quickly.[29]

Sharp objected to Dr. von Preyss-Friedman giving specific time periods. The court found her answer acceptable and offered to reiterate the limitations at Sharp's request.

Dr. von Preyss-Friedman did not return to answer the question before the jury until she testified by telephone three days later, on December 18, 2014. Before bringing out the jury, the court reminded Dr. von Preyss-Friedman of the limitations: "[R]emember that you're not to say that antibiotics would not have helped her in her situation, that they were futile. . . . And not to predict a number of days of life left."[30] The court also confusingly referred to the three to six month time frame. "You've testified appropriately so far with respect to your estimation of . . . three to six months or, you know, 'We just don't know, but she was in end of life.'"[31]

In front of the jury, the court asked the question and Dr. von Preyss-Friedman answered, "On a more probable than not basis, which means 51 percent chance, no."[32] Sharp objected, and the court dismissed the jury so they could address the objection. After comparing Dr. von Preyss-Friedman's answer with her answer during voir dire, the court found the two answers were "categorically

---

[29] RP (Dec. 15, 2014) at 3934-95
[30] RP (Dec. 18, 2014) at 4308-09.
[31] Id. at 4309.
[32] Id. at 4316.

different."[33] The court instructed the jury to disregard Dr. von Preyss-Friedman's answer.

As to this second violation, the court's finding of defense attorney misconduct ignores the fact that Dr. von Preyss-Friedman was responding to a jury question. Although "[p]ersistently asking knowingly objectionable questions is misconduct,"[34] the court allowed the jury question over Sharp's objection. Additionally, it appears the court proceeded directly from the court's clarification to allowing Dr. von Preyss-Friedman to answer the jury question by phone, with no apparent communication between defense counsel and the witness. The record does not support any implication that defense counsel improperly advised or coached Dr. von Preyss-Friedman.

The court's finding of "malicious" discovery abuse also seems to confuse the chronology of events. Notably, the court's findings described Dr. von Preyss-Friedman's December 18 testimony as "ringing the bell a second time."[35] Even if the court did act within its discretion when it determined the December 18 answer

---

[33] Id. at 4321-22 ("It is categorically different because at the time that she was asked this question, she indicated, quote, 'I cannot distinguish whether it would have been between three and six or less than three. . . . [I]t's difficult to say that. I just know that her chance of dying within the next six months was more than 50 percent.'. . . Now she's saying categorically three to six months? No. She would not have survived three to six months. . . . This witness was previously instructed that her previous answers [were] fine and she was not to deviate from her previous answers and, unfortunately, she deviated. . . . The difference here is that she would not render an opinion previously on the three months.").

[34] Teter, 174 Wn.2d at 223 (citing 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PRACTICE § 30:33 (2d ed. 2009)).

[35] CP at 3237.

violated the specific orders prohibiting Dr. von Preyss-Friedman from offering an opinion as to Saundra's life expectancy and was categorically different than the answer in voir dire, her answer was consistent with the court's December 15 limitation concerning futility. The court relied on the cumulative impact of two distinct answers, the first concerning futility of a particular course of treatment and the second regarding life expectancy. As a result, the record does not support the court's finding of "ringing the bell twice."

We conclude the trial court abused its discretion in finding Dr. von Preyss-Friedman's testimony constituted a malicious discovery violation and defense attorney misconduct.

*B. Mr. Fletcher*

Life Care also challenges the trial court's finding of defense attorney misconduct concerning Todd Fletcher. The court found Life Care's counsel "made a false statement to the court" concerning Fletcher's connection to Life Care.[36] The court also found this false statement was the result of the defense attorney "either fail[ing] to conduct an appropriate inquiry . . . or the defense actively misle[ading] the Court."[37]

During trial, one of Sharp's witnesses recognized Fletcher and told Sharp "he was an owner of . . . several of the units here in the state of Washington."[38] As a result, Sharp subpoenaed Fletcher to potentially lay a foundation for corporate

---

[36] CP at 3235.

[37] Id.

[38] RP (Nov. 26, 2014) at 2604.

documents. On November 26, 2014, Life Care challenged the subpoena. Counsel stated, "He has part ownership in the land, not in any building, not in Life Care Center. He has no working knowledge of the function of a skilled nursing facility. He's a landowner. . . . He doesn't own the building. He's not a member of Cascade Medical."[39] When the court asked Fletcher about his involvement, he stated that he was "unofficially an interim division vice president while we recruited for the position."[40]

On December 1, 2014, defense counsel revisited the issue and told the court she had "never met [Fletcher] before he came to this trial."[41]

> [W]hen I asked what is your connection to this facility, his—he told me he owns a small percentage of the actual land. He is not an owner of the license holder Cascade Medical, and he has no other involvement. . . . [H]e said at a different time he served as an interim division vice president, but not at that time. I literally have no knowledge of this gentleman before he came to the courthouse. . . . I don't think he can authenticate anything that they've identified as a document they got an email on. I don't think he has—he has no relationship or ability to identify Cascade Medical documents. . . . He doesn't have any ownership interest in Cascade Medical, which is the one that holds the license for LCC Port Townsend.[42]

The trial court's findings concerning Fletcher are inaccurate. The court found "[t]he defense claimed that not only did Mr. Fletcher have no relevant

---

[39] Id. at 2604-06.

[40] Id. at 2608.

[41] RP (Dec. 1, 2014) at 2628.

[42] Id. at 2628-30.

information, he had no connection to LCCA."[43] But defense counsel never maintained Fletcher had no connection to LCCA; she admitted he owned the land.

On December 1, 2014, the court expressed concern that Fletcher was not "completely honest with [Life Care's counsel] about his position. . . . I'm concerned about what you're getting in terms of your argument."[44] The court's finding of misconduct does not acknowledge the court's concern that Fletcher was not forthcoming with defense counsel.[45] And the record is consistent with the court's initial determination that Fletcher was not honest with defense counsel.[46]

The court also found "Mr. Fletcher stated . . . he could potentially identify a management agreement relevant to the case."[47] The record reveals that Fletcher never made this statement. In reality, defense counsel stated, "[H]e could probably identify a management agreement, but that wouldn't be one that he signed or was familiar with. . . . [H]e might be able to say that looks like a management agreement."[48]

Additionally, defense counsel's statements did not prejudice Sharp because the trial court allowed Sharp to keep Fletcher under subpoena. Sharp never

---

[43] CP at 3235.

[44] RP (Dec. 1, 2014) at 2628-34.

[45] See Clark, 195 Wn. App. at 492 ("It is also untenable if a trial court ignores its own prior ruling when finding misconduct.").

[46] Although CR 59(a)(2) allows a new trial due to the "[m]isconduct of the prevailing party," the identified misconduct concerning Fletcher is based solely on the actions of defense counsel rather than Life Care itself.

[47] CP at 3235.

[48] RP (Dec. 1, 2014) at 2630.

15

argued Fletcher possessed relevant information concerning Saundra's care; Sharp argued only that he might be able to authenticate corporate documents. And Sharp never called Fletcher to authenticate documents or otherwise testify.

We conclude the trial court abused its discretion when it found defense counsel's statements about Fletcher constituted prejudicial misconduct.

### C. Wound Care Book/Venous Ulcer Stasis Records

Life Care next assigns error to the trial court's finding of a discovery violation concerning the venous ulcer stasis records. These records kept track of all the wounds in the facility, with drawings and diagrams of the condition and location of a patient's wounds. The court found the records were responsive to Sharp's request for "all medical records related to Mrs. Sharp's care."[49] The court also found, "Even though a filing error apparently precluded their timely disclosure, there is nothing in the record to explain why the defendants did not identify that these documents existed."[50]

A year before trial, Sharp requested Saundra's medical records from Life Care. Life Care directed Sharp to Saundra's "medical chart from LCC of Port Townsend previously produced to Plaintiffs."[51] Life Care did not produce the venous ulcer stasis records at that time.

During the deposition of Mike Cahill, the former director of nursing at Life Care Port Townsend, Sharp first learned about the "wound care book," otherwise

---

[49] CP at 3230-31.

[50] CP at 3231.

[51] CP at 3119.

known as venous ulcer stasis records. As a result, on October 3, 2014, Sharp sought production of the "Wound Care Book for 2012 for LCC PT."[52]

Life Care's counsel e-mailed the venous ulcer stasis records to Sharp on October 26, 2014. Life Care claimed the records should have been put into Saundra's original chart, but "[w]hen the chart was closed and then copied for us, and then for you, those pages had not yet been put back into Ms. Sharp's original chart. It appears this was a filing error. Today, as soon as we realized that these pages were subsequently put with the closed chart, we copied them and hereby produce them for you."[53]

On November 13, 2014, Mary Shelkey, Sharp's nursing standard of care expert, testified concerning the venous ulcer stasis records and the time of her receipt and review of the records. Outside the presence of the jury, Sharp commented that Shelkey's testimony "create[d] the impression that somehow the expert was not diligent in reviewing documents or somehow plaintiff['s] counsel didn't provide those."[54] The court determined that although the testimony was problematic for various reasons, "no one has asked for relief, and they didn't at the time. So what I would encourage counsel to do is, if you seek relief as a result of that disclosure and that line of questioning, you need to prepare something for me to rule on. I'm not going to do it ad hoc."[55]

---

[52] CP at 3088.

[53] CP at 2719.

[54] RP (Nov. 13, 2014) at 1312.

[55] Id. at 1328.

17

Even if a trial court properly finds prejudice, a party may be "precluded by waiver from obtaining a new trial."[56] "Unless inadequate to remedy the irregularity or misconduct complained of, the aggrieved party must request appropriate court action to obviate the prejudice before the case is submitted to the jury."[57]

Sharp is precluded by waiver from seeking a new trial based on Life Care's late disclosure of the venous ulcer stasis records because they did not seek any of the relief suggested by the court. And the court failed to explain why such relief would have been inadequate to address the alleged discovery violation.

Life Care also argues the trial court failed to identify any particular prejudice suffered by Sharp. The court did not address Life Care's argument that the venous ulcer stasis records are duplicative of information contained in Saundra's previously disclosed medical chart. Therefore, the trial court's new trial findings do not establish that late disclosure of these records had any impact on Sharp's ability to adequately prepare for trial.

We conclude the trial court abused its discretion in finding Life Care committed a discovery violation for late disclosure of the venous ulcer stasis records because Sharp waived this issue and failed to establish any prejudice.

---

[56] Spratt v. Davidson, 1 Wn. App. 523, 526, 463 P.2d 179 (1969).

[57] Id.

### D. Amended Witness List

Life Care also challenges the trial court's findings concerning Life Care's fifth amended witness list. The court found Life Care's counsel committed misconduct because they filed an amended witness list with "new witnesses not previously disclosed."[58] The new witnesses were Olga Kapitanov and Vivian Prange.

On November 26, 2014, Annie Cullen, a resident care manager at Life Care Port Townsend, testified that Kapitanov, the director of nursing, was "there when Sandy Sharp was there."[59] Life Care claims they did not designate Kapitanov earlier because she did not start at Life Care Port Townsend until November 2012, after Sharp left the facility in October 2012. On cross-examination, Life Care elicited testimony that Cullen could not "honestly say exactly what day [Kapitanov] was transferred to [Life Care Port Townsend]. . . . Probably late October."[60]

Cullen also testified that Prange, a nurse at Life Care Port Townsend, previously asked Cullen for help with treatments. Cullen interpreted that to be "the result of a complaint of understaffing" because "[i]f we were adequately staffed . . . those comments would have never been made."[61]

---

[58] CP at 3235.

[59] RP (Nov. 26, 2014) at 2527.

[60] Id. at 2550-51.

[61] Id. at 2557.

Also on November 26, 2014, Basha Berl, a nurse at Life Care Port Townsend, testified that Kapitanov told her that Saundra was "not going anywhere" in response to Berl's concern about Saundra's worsening condition.[62]

On December 2, 2014, Life Care submitted an amended witness list which listed Kapitanov and Prange for the first time. Both were "offered to rebut testimony offered by plaintiff in his case in chief."[63] On the same day, Life Care elicited testimony from Raymond Thompson, division vice president for Life Care Center America Northwest Division, that Kapitanov did not start at Life Care Port Townsend until November 2012, after Saundra left.

On December 4, 2014, Sharp asked the court to order Life Care to "produce all documents that they have reflecting where Olga worked in September and October, so that their claim that she . . . could not have been in the building during Ms. Sharp's residency can be tested."[64] Sharp's counsel admitted, "I'm not addressing the late addition of these witnesses at this time."[65] The court ordered the production of Kapitanov's personnel file, staffing sheets, and punch detail. Life Care provided these documents the next day.

On December 8, 2014, Sharp moved to exclude Kapitanov and Prange as witnesses "[b]ecause Defendant's disclosure . . . is nearly two months late."[66] On

---

[62] Id. at 2592.

[63] CP at 880.

[64] RP (Dec. 4, 2014) at 3178.

[65] Id. at 3179.

[66] CP at 888.

December 12, 2014, Life Care told the court they would not call Kapitanov, so the court determined the motion to exclude was moot as to Kapitanov. And on December 15, 2014, Sharp stated, "[T]he defense has already determined they're not going to call Ms. Prange, so that motion will become moot."[67]

Life Care claims the court's findings concerning the amended witness list are not supported by the record and are inconsistent with trial management decisions. Although the court did not rely on inaccurate facts when it entered these findings, the court did fail to address how Sharp was prejudiced by the amended witness list because Life Care never called Kapitanov or Prange to testify. The record does not establish the amended witness list impacted Sharp's ability to prepare for trial.

We conclude the trial court abused its discretion in finding prejudicial defense counsel misconduct concerning the amended witness list.

E. *Guide to Infection Control*

Life Care next assigns error to the trial court's findings concerning disclosure of "A Guide to Infection Control." The trial court found Life Care failed to timely disclose the guide.

In January 2014, Sharp requested all records concerning "any policy, rule, regulation, procedure, protocol, guideline, form, or standard concerning or referring to the evaluation of patients to determine their potential for developing sores, bed sores, and/or blisters and the treatments of sores, bed sores, and/or

---

[67] RP (Dec. 15, 2014) at 3823.

blisters."[68] On February 27, 2014, Life Care objected to the request as "vague and unintelligible" but stated they would turn over such records "upon entry of a protective order."[69]

In April 2014, Sharp again requested Life Care "produce accurate copies of the Policy and procedure manual for staff in effect at Life Care Center of Port Townsend, Cascade Medical Investors Limited Partnership, as of January 1, 2012."[70] On May 12, 2014, Sharp's counsel e-mailed Life Care's counsel and said, "In the interest of efficiency, if LCC provides Plaintiff with a summary or table of contents of LCC's policies, Plaintiff will request specific policies."[71]

On May 16, 2014, Life Care provided a table of contents for "Clinical Services Policies & Procedures Nursing," Volumes 1 and 2. On May 21, 2014, Sharp requested Chapter 10 from Volume 2, along with other chapters from the two manuals. Chapter 10 contained the general infection control policy with a reference to "A Guide to Infection Control" from Life Care Centers of America. On May 29, 2014, Life Care provided Chapter 10, along with the other requested sections. Sharp specifically requested production of "A Guide to Infection Control" on August 29, 2014, and Life Care produced the guide on September 29, 2014, more than a month before trial.

---

[68] CP at 3111, 3122.

[69] CP at 3122.

[70] CP at 2321.

[71] CP at 2316.

Life Care contends the trial court failed to identify any particular prejudice suffered by Sharp. The trial court generally concluded that Life Care's various discovery violations "prevented a fair trial."[72] But there are no particular findings regarding the prejudicial impact of Life Care's untimely disclosure of "A Guide to Infection Control."

There are legitimate concerns with lack of prejudice. Sharp had the guide more than a month before trial. During Nataliaya Yakimenko's deposition, Sharp asked about the guide, but did not seek to admit or otherwise refer to the guide during trial. And the record does not suggest that Sharp provided the actual guide in support of the motion for new trial. As a result, there is no evidence that the trial court reviewed or considered the contents of the actual guide when analyzing the presence of any prejudice from its late disclosure. In this context, the trial court's general finding of prejudice is inadequate.

*F. Ms. Yakimenko*

Life Care also challenges the trial court's findings concerning Nataliya Yakimenko. Yakimenko was called by Life Care as a corporate nursing witness. The trial court found Life Care's failure to disclose Yakimenko as a fact witness was a discovery violation. The court also found Life Care committed a discovery violation for failing to disclose Yakimenko's "calendar."[73] The trial court found this information was responsive to several discovery requests. The trial court also

---

[72] CP at 3241.
[73] CP at 3229.

23

found defense counsel's failure to produce this information constituted misconduct.

A year before trial, Sharp requested the name and contact information of "each person having personal knowledge of facts material to this case."[74] Life Care did not identify Yakimenko. Shortly before trial, Sharp asked Life Care to "[p]roduce a list of names of all doctors, nurses, staff members, and caregivers of any kind who provided care to Mrs. Sharp during her residency at LCC PT."[75] Again, Life Care did not identify Yakimenko.

As the regional director of clinical services, Yakimenko regularly visited various Life Care facilities. While assessing the quality of nursing care at a given facility, Yakimenko would work "shoulder to shoulder" with nurses, observing and assisting them.[76] On a few occasions while Saundra was at Life Care, Yakimenko assisted other nurses providing care to Saundra. On December 8, 2014, Yakimenko testified that she had "[a] couple of interactions with [Saundra,] . . . at least four different interactions."[77] On cross-examination, Sharp questioned Yakimenko about her memory. Sharp asked Yakimenko how she could determine the exact date she saw Saundra, and she responded that she would "have to look through notes."[78]

---

[74] CP at 3105.

[75] CP at 3088.

[76] RP (Dec. 8, 2014) at 3267.

[77] Id. at 3244.

[78] Id. at 3274.

The next day, Life Care's counsel told the court that she might offer Yakimenko's "visit reports *which constitute her calendar of events*," to respond to Sharp questioning Yakimenko's memory.[79] Sharp asked the court to exclude the notes. The court determined that Yakimenko could "testify that she keeps computer records, that she keeps a calendar, and that she went back over the evening hours between yesterday and today and did what she did, double checked, and made sure that that was correct."[80]

Also on December 9, 2014, Yakimenko identified three more days she interacted with Saundra. On direct, Life Care asked Yakimenko how she identified the additional days, and Yakimenko responded, "[T]hat's from my calendar and my notes that I have saved."[81]

Sharp requested the production of Yakimenko's calendar pursuant to an order in limine that required Life Care to produce all documents reviewed by defense witnesses in preparation for trial. Life Care agreed to provide any documents reviewed by Yakimenko but maintained the calendar was not subject to the order. The next day, Sharp e-mailed Life Care to follow up about disclosure of Yakimenko's calendar.

Life Care argues the court's findings of a discovery violation and misconduct for Life Care's failure to disclose Yakimenko as a fact witness are premised on inaccurate facts and are inconsistent with trial management

---

[79] CP at 1210 (emphasis added).

[80] RP (Dec. 9, 2014) at 3314.

[81] Id. at 3349.

25

decisions. But the record establishes that, even though there were only a few instances, Yakimenko was present and involved with Saundra's treatment. It was within the discretion of the trial court to determine that Life Care should have disclosed Yakimenko's interactions with Saundra in response to discovery requests for information about caregivers and individuals with factual knowledge of the case.

During oral argument in this court, Life Care contended Yakimenko was technically disclosed when they provided Saundra's medical chart. Although Yakimenko testified that her initials appear in Saundra's chart in several instances, she also testified concerning other times she interacted with Saundra which do not appear in the chart.

Life Care also argues the trial court failed to identify any particular prejudice suffered by Sharp. The trial court did note that Yakimenko's testimony that she interacted with Saundra was a surprise without articulating any particular prejudice resulting from the surprise. In context, Yakimenko's interactions with Saundra were largely, if not entirely, in her role of observing the quality of the work of the nurses providing direct care to Saundra. She described a few treatment notes she made in which she observed the presence of a leg blister containing clear fluid, provided a tray, and tried to convince Saundra of the benefits of using a salt substitute. This testimony appears to be cumulative to the observations by nurses giving direct care and was on largely undisputed topics. Notably, as to

Yakimenko's testimony about staffing levels, there was no surprise because Sharp had addressed staffing levels during Yakimenko's two CR 30(b)(6) depositions.

And, in view of the cumulative and noncontroversial nature of the surprise testimony, there was no showing that lack of notice inhibited Sharp's ability to adequately cross-examine Yakimenko. Notably, Sharp did not request additional time to prepare for cross-examination.

Absent some stronger link between Life Care's failure to disclose Yakimenko as a fact witness and any significant disputed fact, the trial court's general finding of prejudice does not satisfy the level of prejudice required to grant a new trial. Life Care's failure to disclose did not make it extremely difficult for Sharp to prepare for trial.

As to Life Care's failure to produce Yakimenko's calendar, there is no resolution by the trial court of Life Care's assertion that Yakimenko had consulted her "visit reports which constitute her calendar of events."[82] And Life Care provided Yakimenko's visit reports for 2012. Sharp did not seek further relief regarding the calendar.

The trial court's general finding of prejudice is not compelling in this context. The issues related to Yakimenko do not support a new trial.

---

[82] Life Care claims Yakimenko did not review an actual calendar, but rather "notes she maintained on her laptop relating to meetings she attended during her visits to Life Care Port Townsend." Appellant's Br. at 42.

### G. Dr. Forbes's Meeting Notes

Life Care also challenges the trial court's findings concerning disclosure of Dr. Karen Forbes's meeting notes. Dr. Forbes was the medical director at Life Care Port Townsend. After Saundra's death, Dr. Forbes held a meeting to discuss deficiencies in charting. At the meeting, Dr. Forbes provided excerpts of Saundra's chart with her handwritten criticism.

In early 2014, Sharp requested information for "all persons who are or have been investigating" Saundra's case.[83] Shortly before trial, Sharp requested (1) "all documents related to any internal investigation of Mrs. Sharp's case," (2) "all documents made by staff members or employees at LCC PT and sent to LCCA regarding Mrs. Sharp's case," (3) "all documents regarding remedial measures taken with respect to improving wound care and/or infection control at LCC facilities."[84] Life Care did not produce Dr. Forbes's notes in response to these discovery requests.

At some point, Sharp obtained Dr. Forbes's meeting notes And on November 18, 2014, Sharp offered them as a party opponent admission. Life Care argued the notes were not admissible because Dr. Forbes was an independent contractor and did not have the authority to bind Life Care as an agent. The court admitted the notes because "it was part of her job assignment to

---

[83] CP at 3105.
[84] CP at 3094, 3087.

meet with the staff and talk to them," and she "did have the authority to make this statement."[85]

In the court's new trial findings, Life Care's failure to disclose the notes was found to be a discovery violation. The record does support the finding that the notes were responsive to Sharp's request for all documents related to any internal investigation of Mrs. Sharp's case, but the prejudice resulting from Life Care's "late disclosure" of the meeting notes depends in part on the extent of the delay. Here, the record does not reveal how or when Sharp obtained the notes,[86] and it does not appear that the trial court considered the impact of the delay in obtaining the notes. In this setting, the trial court's general finding of prejudice is not adequate.

We conclude the trial court abused its discretion in granting a new trial for this discovery violation because there was not an adequate showing of prejudice.

*H. Punch Detail*

Life Care next challenges the trial court's finding of discovery abuse concerning the punch detail. The punch detail shows the clock-in and clock-out times for Life Care Port Townsend employees. The trial court found Life Care failed to timely disclose the punch detail.

On August 20, 2014, during Sharp's deposition of Brooke Mueller, a CR 30(b)(6) corporate witness, Mueller referenced certain staffing documents. On

---

[85] RP (Nov. 18, 2014) at 1791.

[86] At oral argument, Sharp asserted they received the notes when one of the nurses testified. Sharp offered the notes during the testimony of nurse Marilyn Smith on November 18, 2014, but the record contains no mention of how or when Sharp became aware of them.

August 28, 2014, Sharp asked Life Care to produce some of those documents, including "[e]mployee time cards for Sept and Oct of 2012" and a "[l]ist of names of employees during Sharp's residency at LCC PT."[87] On September 29, 2014, Life Care responded to Sharp's request with the employee punch detail.

During trial, when discussing the admissibility of an ER 1006 summary chart of staffing levels for September to October 2012, Life Care repeatedly referred to the punch list as "raw data."[88] But on January 5, 2015, Thompson testified that the punch list was edited by "correction sheets."[89] Sharp asked the court to exclude the punch detail because Life Care had not provided the correction sheets needed to test the accuracy of the punch list. The court determined the punch list was admissible and the correction sheets "should be provided . . . so that [c]ounsel could have an opportunity to check the accuracy of the data."[90] Life Care provided the correction sheets the next day.

As to the punch detail itself, Sharp did not request the punch detail until August 2014, and Life Care timely provided the document in September, more than a month before trial.[91]

---

[87] CP at 328.

[88] See RP (Dec. 12, 2014) at 3800, 3803-04.

[89] RP (Jan. 5, 2015) at 4477-88.

[90] Id. at 4489.

[91] In the memorandum opinion granting a new trial, the court appears to find various staffing documents were responsive to interrogatories 14, 31, and 33 from Sharp's January 2014 discovery requests, but the court fails to identify the specific request to which the punch detail was responsive. And the vaguely identified requests do not support any finding that the punch list was responsive to a request prior to August 2014. In interrogatory 14 and the accompanying request for

Life Care also contends the trial court failed to identify any particular prejudice suffered by Sharp due to the untimely disclosure of the punch detail. The court's general prejudice determination that Life Care's various discovery violations prevented a fair trial is not compelling when Sharp had the punch detail for over a month before the trial started in November 2014.

The court found Life Care committed a discovery violation when they "repeatedly represented that the punch list was raw data."[92] In the new trial findings, the court also found the correction sheets "were not referenced, identified, or disclosed by Defendants during discovery" even though such information was "highly responsive to a number of interrogatories."[93]

As to the "raw data" statements and the failure to disclose the existence of correction sheets, Sharp is precluded by waiver from seeking a new trial on these grounds. On January 6, 2015, the day Life Care provided the correction sheets, the court told Sharp, "[Y]ou should have the opportunity to be able to prepare with

---

production 10, Sharp seeks any and all evidence "relative to the occurrence or the issue of damages." CP at 3108, 3121. Interrogatory 14 is not compelling because it is overly broad. In interrogatory 31 and request for production 18, Sharp seeks information concerning "staffing reductions or increases." CP at 3115, 3123. The punch detail is not responsive to interrogatory 31 because the punch detail would not meaningfully correlate to changes in staffing levels. In interrogatory 33 and request for production 20, Sharp seeks the "patient to staff ratio at the facility." CP at 3116, 3124. Even if the punch detail provides very general background to staff ratio computations, the punch detail is not responsive to interrogatory 33 because Life Care determined the staffing ratios by a review of a labor analysis. And the labor analysis and punch detail are separate documents.

[92] CP at 3223.

[93] Id.

those documents, so I will give you the time that you actually need."[94] Prior to the court's statement, Sharp's counsel indicated he would be prepared to cross-examine on the reliability of the punch detail the next day. The next day, Sharp told the court he had gone through the punch detail and correction sheets "in extreme detail."[95]

Similarly, Sharp cannot show prejudice because counsel told the court he had sufficient time to review the correction sheets, and he was able to cross-examine Thompson on the reliability of the information. The trial court did not reconcile its finding of prejudice with Sharp's representations at trial.

We conclude the trial court abused its discretion in finding Life Care committed discovery abuse in this area because the production of the punch detail was timely. As to the correction sheets and "raw data" statements, Sharp waived this issue and there is a lack of prejudice.

### I. Mr. Thompson

Life Care next assigns error to the trial court's findings concerning Raymond Thompson. Life Care produced Thompson as CR 30(b)(6) corporate witness for Life Care Centers of America. The trial court found that Thompson "possessed relevant factual information" concerning staffing.[96] The court found that the failure to disclose this information constituted a discovery violation and defense attorney misconduct.

---

[94] RP (Jan. 6, 2015) at 4605.
[95] RP (Jan. 7, 2015) at 4640.
[96] CP at 3231, 3234-35.

On July 24, 2014, Sharp e-mailed Life Care's counsel to seek a deposition of Thompson as a fact witness. On July 31, 2014, Life Care's counsel responded and stated Thompson "had no knowledge of Ms. Sharp's care."[97] On August 5, 2014, Life Care moved for a protective order because "Mr. Thompson has no discoverable information related to this lawsuit."[98] The court denied the protective order, and Thompson was deposed before trial as a fact witness and during trial as a CR 30(b)(6) witness.

Even though Life Care should have disclosed Thompson had significant information concerning staffing procedures and documentation, the trial court did not identify any particular prejudice suffered by Sharp. Specifically, Sharp was able to depose Thompson as a fact witness before trial. The trial court's general finding of prejudice is not compelling in this context.

As to misconduct, the trial court findings depend on "[t]he defense falsely stat[ing]" Thompson did not have relevant information.[99] But on January 7, 2015, the court stated, "I don't even think the defense attorney knew [ ] until after Mr. Thompson had been questioned about databases at the company and what those databases reflect."[100] The record is entirely consistent with Thompson not being

---

[97] CP at 183.

[98] CP at 180-81.

[99] CP at 3234.

[100] RP (Jan. 7, 2015) at 4777.

forthcoming with defense counsel.[101] The trial court did not acknowledge or reconcile this initial determination.[102] As a result, the record does not support the court's findings of attorney misconduct.

We conclude that the court abused its discretion in finding prejudicial discovery abuse and defense attorney misconduct based on Thompson.

*J. Staffing Ratios*

Life Care next assigns error to the trial court's findings concerning discovery of staffing ratios. The trial court found Sharp requested (1) "information regarding patient-to-staff ratios at the facility," (2) "all documents that related to LCCA's evaluation of staffing levels at the facility," and (3) "all documents reflecting staffing levels and other information in Mrs. Sharp's unit."[103] The trial court also found "daily staffing sheets," which "designated what employees worked in which units . . . and were responsible for a particular resident's chart notes . . . were relevant to the Plaintiff's interrogatories and to their claims."[104] And the trial court found "Defendants failed to disclose the existence [and destruction] of daily staffing sheets."[105] The trial court identified information about staffing levels was responsive to several discovery requests.

---

[101] Although CR 59(a)(2) allows a new trial due to the "[m]isconduct of prevailing party," the identified misconduct concerning Thompson is based solely on the actions of defense counsel.

[102] See Clark, 195 Wn. App. at 492 ("It is also untenable if a trial court ignores its own prior rulings when finding misconduct.").

[103] CP at 3225.

[104] CP at 3225-26.

[105] CP at 3226.

In January 2014, Sharp requested information on the "patient staff ratio at the facility."[106] Life Care responded, "Assuming this Interrogatory refers to the nursing caregiver patient ratio for the four weeks of Ms. Sharp's residency, [per-patient-day] for nursing care was 3.56, 3.43, 3.15 and 3.23."[107] Sharp also requested all records responsive to this interrogatory. Life Care did not disclose or produce the daily staffing sheets. Shortly before trial, Sharp requested "all documents relating to LCCA's evaluation of staffing levels at LCC PT"[108] Life Care claimed "they [were] not aware of any such written documents."[109]

On January 5, 2015, Amanda Edgar, a nurse at Life Care Port Townsend, testified that each day employees typically initialed "staffing sheets" containing "nurses names and what room numbers they are assigned" on a given day, but she had no knowledge whether those daily sheets were preserved.[110] On January 7, 2015, Thompson also testified about staffing sheets.[111] Thompson testified the purpose of the daily staffing sheets was to allow staff to "have an idea as to where they are supposed to be working" that day.[112] Life Care did not preserve the staffing sheets, and they were not required to do so.

---

[106] CP at 3116.

[107] Id.

[108] CP at 3093.

[109] Id.

[110] RP (Jan. 5, 2015) at 4573.

[111] RP (Jan. 7, 2015) at 4707 ("That would tell you who, prior to showing up that day, was scheduled to work in the facility that we thought was going to come to work and would be working on those units for those room numbers.").

[112] Id. at 4706.

The trial court found Life Care "failed to disclose the existence of the daily staffing sheets."[113] The implied premise of this finding is that the staffing sheets were in existence at the time of Sharp's discovery requests. But the record before us does not support any reasonable inference that those daily sheets were regularly preserved and in existence at the time of the discovery request. And the trial court did not find that Life Care had any obligation to retain and preserve daily staffing sheets.

Because the premise fails, the trial court's findings regarding daily staffing sheets do not support any discovery violation or attorney misconduct. We conclude the record does not support the trial court's finding of a prejudicial discovery violation for Life Care's failure to disclose the existence of the staffing sheets which were never retained.

### K.  CR 30(b)(6) Witness

Life Care also challenges the trial court's findings concerning CR 30(b)(6) corporate witness testimony. The trial court found that Life Care failed to produce a prepared corporate witness and that this failure was willful. The court found this failure constituted a discovery violation and defense attorney misconduct.

On July 30, 2014, Sharp requested a CR 30(b)(6) deposition on a variety of topics. On August 20, 2014, Life Care produced Brooke Mueller, the executive director of Life Care Center Port Townsend, to respond to the listed topics. After a

---

[113] CP at 3226.

few hours, Sharp suspended the deposition to provide Mueller "with time to prepare to answer questions" concerning staffing.[114]

On August 29, 2014, Sharp renewed their request for a deposition of a CR 30(b)(6) witness and provided a more detailed list of topics, including, "[a]ll employment statuses of all staff members or employees, including but not limited to CNAs, RNs, wound care nurses, the director of nursing."[115]

On September 12, 2014, Sharp also successfully moved for an order compelling the attendance of a "[p]roperly [p]repared" CR 30(b)(6) witness for deposition "without [s]peaking [o]bjections or [i]nstructions [n]ot to [a]nswer [q]uestions."[116] On October 6, 2014, Sharp conducted a second deposition of Mueller.

During the deposition, Mueller had difficulty answering Sharp's question of how many people worked a particular shift, for example, October 9, 2012, even after a 24-minute recess to allow her to work with the 177-page punch list she brought to the deposition. Sharp asked Mueller, "[I]s there someplace that you are aware of where there is a record of how many nurses were available on each shift and what their professional training was?"[117] Mueller responded,

> There is not a list. I would have to go through and put every individual's name, either looking in their associate file or looking on the Washington State provider credential search to find out what title they held. There is not a list of people who were assigned to any

---

[114] CP at 325.
[115] CP at 333.
[116] CP at 348.
[117] CP at 5421.

37

given unit on any given day. That . . . list does not exist. So it is these time punch details and it is going through person by person to—for me to verify what licensure they hold, because I was not in the facility at the time that this occurred. So I do not know each of these associates.[118]

The court determined Mueller was not prepared at the second deposition and "that this was a violation of the Court's order to produce a prepared witness."[119] The court sanctioned this "willful" discovery violation by limiting Mueller's testimony to her deposition testimony.[120]

Two of Life Care's arguments are not compelling. First, Life Care argues the trial court did not identify why the original sanction of binding Mueller to her deposition testimony was insufficient. But this argument ignores the trial court's explicit finding "that the sanction it imposed at trial . . . denied the Plaintiffs an opportunity to discover and produce for the jury information relevant to the pre-defined 30(b)(6) topics from the corporate witnesses."[121]

Second, Life Care argues that Sharp failed to object at trial, but Sharp did object at trial by seeking CR 37 sanctions, and the court granted the request. Sharp is not precluded by waiver from seeking a new trial as a result of Life Care failing to produce a "prepared" corporate witness.

Life Care also claims Sharp cannot show prejudice warranting a new trial based upon this single discovery violation. In this unique context, we agree.

---

[118] Id.

[119] RP (Dec. 18, 2014) at 4351.

[120] Id. at 4352-53.

[121] CP at 3228.

Sharp's claim of inadequate staffing does implicate the number and qualifications of staff available to care for Saundra. But the lack of a single witness prepared to correlate several different documents and reconcile the number and qualification of particular staff was of limited significance. Notably, Sharp had access to records allowing such a determination. Sharp presented the jury an exhibit comparing the number of certified nurse assistants to nurses at Life Care each month. And other witnesses were available to address the adequacy of staffing. At trial, Sharp elected to present the testimony of former nurses at Life Care Port Townsend that the staff was overworked. There is no finding by the trial court that the lack of a fully prepared CR 30(b)(6) witness able to correlate the number of employees and their qualifications made it extremely difficult for Sharp to prepare for trial.

We are mindful of the great deference to a trial court in finding prejudice and granting a new trial. But the trial court's general conclusions about orderly preparation for trial do not establish adequate prejudice warranting a new trial based on this single discovery issue

*L. Conclusion*

In this unique setting, the trial court order granting a new trial fails. The trial court did not make its decision until more than a year after the parties completed briefing on the motion for new trial, and the trial court did not have access to the full record of the proceedings. As a result, several of the trial court findings are inaccurate. In some instances, the trial court failed to reconcile its order granting a

39

new trial with its rulings and observations during trial. The record does not support willful and malicious incidents of misconduct by defense counsel. The trial court ignored the doctrine of waiver as it applies to motions for new trial. Finally, the trial court's vague and general observations about prejudice do not apply the correct standard for a new trial.

Contrary to the theme relied upon by the trial court, there is no pattern of malicious attorney misconduct or egregious discovery abuses.

## II. Attorney Fees and Costs

Because we reverse the order granting a new trial, the trial court's corresponding award of attorney fees and costs to Sharp also fails.

## III. Fees on Appeal

Sharp seeks fees on appeal under RAP 18.1(a), CR 26, and CR 37. Because Sharp is not the prevailing party on appeal, we decline to award fees.

Therefore, we reverse the orders granting a new trial and awarding costs and fees to Sharp.

WE CONCUR: